IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IN RE NIKE, INC. SECURITIES LITIGATION | Case No.: 3:24-cv-00974-AN<br><br>OPINION AND ORDER |

        Shareholders of Nike, Inc. ("Nike") filed two securities class actions against defendants Nike, John J. Donahoe, II, and Matthew Friend, alleging violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. On August 8, 2024, the Court consolidated the two cases into the above-captioned action. Stip. & Order Consolidating Related Securities Actions, ECF [11]. On August 19, 2024, four movants timely filed motions for appointment as lead plaintiff: (1) Meitav Provident and Pension Funds Ltd., Kranot Hishtalmut Le Morim Tichoniim Morey Seminarim Ve Mefakhim Hevra Menahelet Ltd., Kranot Hishtalmut Le Morim Ve Gananot Hevra Menahelet Ltd., Menora Mivtachim Insurance Ltd., and Menora Mivtachim Pensions and Gemel Ltd. (collectively, the "Meitav Group"), ECF [17]; (2) Caisse de dépôt et placement du Québec ("CDPQ") and Deka Investment GmbH ("Deka") (collectively, the "CDPQ-Deka Group"), ECF [19]; (3) C+F Global, C+F Global Route, C+F Very Low, C+F World Equities, Universal Invest Dynamic, Universal Invest High, and Universal Invest Medium (collectively, "C+F-Universal Group"), ECF [21]; and (4) State of Wisconsin Investment Board ("SWIB"), ECF [23]. After reviewing the movants' pleadings, the Court finds that oral argument will not help resolve the matter. Local R. 7-1(d). For the following reasons, the CDPQ-Deka Group's motion is GRANTED, and the other three motions are DENIED.

## LEGAL STANDARD

**A.     Appointment of Lead Plaintiff**

The Private Securities Litigation Reform Act ("PSLRA") sets forth the procedure for the appointment of a lead plaintiff in securities class actions. 15 U.S.C. § 78u-4(a)(1). The Ninth Circuit has set forth a three-part test for determining whether a movant meets the PSLRA's criteria for lead plaintiff. *In re Cavanaugh*, 306 F.3d 726, 729-30 (9th Cir. 2002).

First, a court must determine whether the plaintiff or plaintiffs in the first-filed action issued a notice publicizing the pendency of the lawsuit, the claims made, and the purported class period "in a widely circulated national business-oriented publication or wire service[.]" 15 U.S.C. § 78u-4(a)(3)(A)(i). The notice must also alert the public that "any member of the purported class may move the court to serve as lead plaintiff[.]" *Id.* § 78u-4(a)(3)(A)(i)(II).

Second, a court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members[.]" *Id.* § 78u-4(a)(3)(B)(i). The most adequate plaintiff is presumed to be the person or group that has the "largest financial interest" in the litigation and satisfies Rule 23's adequacy and typicality requirements. *Id.* § 78u-4(a)(3)(B)(iii)(I).

Third, a court must determine whether the presumption in favor of the most adequate plaintiff was rebutted. *Id.* § 78u-4(a)(3)(B)(iii)(II). To rebut the presumption, there must be proof that the presumptively most adequate plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Id.* Proof is key—the presumption may not "be set aside for any reason that the court may deem sufficient." *See In re Mersho*, 6 F.4th 891, 899 (9th Cir. 2021) (quoting *Cavanaugh*, 306 F.3d at 729 n.2) (internal quotation marks omitted). "Competing movants must convince the district court that the presumptive lead plaintiff would not be adequate, not merely that the district court was wrong in determining that the prima facie elements of adequacy were met." *Id.* at 901.

B.     **Approval of Lead and Liaison Counsel**

Under the PSLRA, the lead plaintiff is given the right, subject to court approval, to "select and retain counsel to represent the class."  15 U.S.C. § 78u-4(a)(3)(B)(v).  "[T]he district court should not reject a lead plaintiff's proposed counsel merely because it would have chosen differently."  *Cohen v. U.S. Dist. Ct. for N. Dist. of Cal.*, 586 F.3d 703, 711 (9th Cir. 2009) (citation omitted).  "[I]f the lead plaintiff has made a reasonable choice of counsel, the district court should generally defer to that choice." *Id.* at 712 (citations omitted).

## BACKGROUND

A.     **Factual Allegations**

This action alleges securities fraud claims on behalf of a class of all persons and entities who purchased or otherwise acquired Nike Class B common stock from March 19, 2021, to June 27, 2024 (the "Class Period").  Compl., ECF [1], ¶ 1.  Defendant Nike is a global athletic footwear and apparel company headquartered in Beaverton, Oregon, that designs, markets, and sells products for its Nike, Jordan, and Converse brands.  *Id.* ¶¶ 18, 24.  Defendant Donahoe is Nike's President and Chief Executive Officer, and defendant Friend is Nike's Executive Vice President and Chief Financial Officer.  *Id.* ¶¶ 19-20.

In 2017, Nike began implementing its "Consumer Direct Offense" strategy, which focused on increasing innovation and direct connections with customers.  *Id.* ¶ 26.  Nike began reporting the financial metrics from Nike Digital and its retail stores as "Nike Direct."  *Id.*  In connection with Nike's direct-to-consumer ("DTC") strategy, Nike dropped nearly one-third of its sales partners by late 2020 and significantly reduced sales to other major retail clients.  *Id.* ¶ 29.

In a series of announcements from March 2021 to March 2022, defendants repeatedly touted the purported strength of Nike's business model, particularly in Nike's digital and DTC strategies. *See id.* ¶¶ 31-38.  On March 19, 2021, when Nike announced its third quarter fiscal year 2021 financial results, defendants highlighted increasing quarterly revenues led by revenue growth in China and increased Nike Brand digital sales in all geographies.  *Id.* ¶ 31.  Defendants stressed Nike's success in digital as a unique competitive advantage in driving Nike's growth.  *Id.* ¶¶ 31-32.  On June 24, 2021, when Nike

3

announced its fourth quarter and full fiscal year 2021 financial results, defendants focused on the importance of Nike's digital and DTC strategies in fueling "long-term sustainable, profitable growth[.]" *Id.* ¶ 33. Defendant Friend noted that defendants intended for Nike Direct to represent approximately sixty percent of the business in fiscal year 2025, "led by growth in digital." *Id.* ¶ 35. On December 20, 2021, when Nike announced its second quarter fiscal year 2022 financial results, defendant Donahoe highlighted Nike's digital presence as an "emerging competitive advantage" in strengthening Nike's brand against its historical competitors. *Id.* ¶¶ 36-37. On March 21, 2022, when Nike announced its third quarter fiscal year 2022 financial results, defendants stressed Nike's "growing digital advantage" in "continu[ing] to drive greater competitive separation[.]" *Id.* ¶ 38.

However, on June 27, 2022, Nike reported declining quarterly revenues and wholesale revenues, as well as declining quarterly gross margins and lower-than-expected gross margin growth. *Id.* ¶ 40. The same day, defendant Donahoe stated that Nike remained "confident in [its] long-term strategy and [its] growth outlook[,]" and downplayed concerns regarding defendants' outlook in China. *Id.* ¶ 42. Following this news, the price of Nike Class B common stock declined $7.72 per share, or nearly seven percent, to close at $102.78 per share on June 28, 2022. *Id.* ¶ 43. On September 29, 2022, Nike reported significant year-over-year declines in net income, diluted EPS, and gross margin, and a four percent increase in Nike's quarterly revenue. *Id.* ¶ 44. Following this news, the price of Nike Class B common stock declined $12.21 per share, or nearly thirteen percent, to close at $83.12 per share on September 30, 2022. *Id.* ¶ 46.

On December 20, 2022, when Nike announced its second quarter fiscal year 2023 financial results, defendants continued to tout the importance of DTC and digital channels in Nike's growth strategy. *Id.* ¶ 47. On June 29, 2023, when Nike announced its fourth quarter and full fiscal year 2023 financial results, defendant Friend announced that Nike's 2024 financial outlook of revenue growth was due, in part, to Nike's competitive "advantages, strong consumer momentum, [] robust product innovation pipeline, healthy inventory and a normalized flow of supply." *Id.* ¶ 49. Defendant Donahoe stated that Nike was primed to "leverage [its] competitive advantages[,]" such as its digital presence, to both "gain [market]

share [and] grow the market." *Id.* ¶ 50.

On December 21, 2023, in its second quarter fiscal year 2024 financial results, Nike announced total revenue growth year-over-year of one percent. *Id.* ¶ 52. Defendant Friend revealed that "[t]otal retail sales . . . fell [below] expectations" and that Nike's digital platforms lost consumer traffic to competitors because of "higher levels of promotional activity across the marketplace." *Id.* (alteration in original). Following this news, the price of Nike Class B common stock declined $14.49 per share, or nearly twelve percent, to close at $108.04 per share on December 22, 2023. *Id.* ¶ 53. On March 21, 2024, in its third quarter fiscal year 2024 financial results, Nike announced a three percent year-over-year decline in EMEA revenue, a three percent year-over-year decline in Nike Digital revenue, and quarterly revenue growth of approximately 0.4% year-over-year in Nike Direct. *Id.* ¶ 54. Defendant Donahoe stated that Nike would combine Nike Direct with reinvestment in its wholesale partners to "grow the total marketplace." *Id.* Following this news, the price of Nike Class B common stock declined $6.96 per share, or nearly seven percent, to close at $93.86 per share on March 22, 2024. *Id.* ¶ 55.

As alleged in the complaint, throughout the Class Period, defendants misrepresented or failed to disclose that Nike's DTC strategy was unable to generate sustainable revenue growth and that Nike's purported competitive advantages were unable to protect it from intense competitive pressures after Nike largely disengaged from many of its wholesale and retail partners to focus on its DTC strategy. *Id.* ¶ 11. As a result of defendants' wrongful acts and omissions and the decline in the market value of Nike's Class B common stock that followed the revelation of defendants' misrepresentations, the plaintiffs and other class members suffered significant damages. *Id.* ¶ 65.

**B.     Procedural History**

On June 20, 2024, the City Pension Fund for Firefighters and Police Officers in the City of Pembroke Pines ("Pembroke Pines") filed the first of the consolidated securities class actions, *City Pension Fund for Firefighters and Police Officers in the City of Pembroke Pines v. Nike, Inc.*, No. 3:24-cv-00974-AN, in this district against defendants. On the same day, counsel for Pembroke Pines published in *Business Wire* a notice concerning that class action. Decl. Timothy S. DeJong Supp. Mot. for Appt. as Lead Pl.

("DeJong Decl."), ECF [20], Ex. C.

On August 19, 2024, the Meitav Group, CDPQ-Deka Group, C+F-Universal Group, and SWIB timely moved for appointment as lead plaintiff. *See* Mot. of Meitav Grp. for Appt. as Lead Pls., ECF [17]; Mot. for Appt. as Lead Pl. ("CDPQ-Deka Grp. Mot."), ECF [19]; C+F-Universal Grp. Mot. for Appt. as Lead Pl., ECF [21]; SWIB Mot. for Appt. as Lead Pl., ECF [23]. The C+F-Universal Group subsequently filed a notice of non-opposition. C+F-Universal Grp. Resp. to Competing Mots. for Appt. as Lead Pl., ECF [30], at 1. The CDPQ-Deka Group and Meitav Group oppose the other motions. Mem. of L. Further Supp. Mot. for Appt. as Lead Pl. ("CDPQ-Deka Grp. Resp."), ECF [31], at 2; Corrected Mem. of L. Further Supp. Mot. of Meitav Grp. for Appt. as Lead Pls. ("Meitav Grp. Resp."), ECF [39-1], at 1. SWIB does not oppose the CDPQ-Deka Group's motion but does oppose the Meitav Group's motion. SWIB Reply Br. Further Supp. Mot. for Appt. as Lead Pl., ECF [38], at 8. Accordingly, the Meitav Group, CDPQ-Deka Group, and SWIB remain as lead plaintiff candidates.

## DISCUSSION

### A.  Appointment of Lead Plaintiff

1.  *Procedural Requirements*

On June 20, 2024, Pembroke Pines filed the first of the related class actions against defendants. On the same day, counsel for Pembroke Pines published in *Business Wire* a press release pursuant to 15 U.S.C. § 78u-4(a)(3)(A)(i). This notice was timely because it was published within 20 days after the filing of the complaint, and it announced the pendency of the action, the claims asserted therein, the purported class period, and the lead plaintiff deadline. The Meitav Group, CDPQ-Deka Group, and SWIB all moved for appointment as lead plaintiff by the August 19, 2024, deadline. Each movant has also certified that it is willing to serve as lead plaintiff. *See* Decl. Jeremy A. Lieberman Supp. Mot. of Meitav Grp. for Appt. as Lead Pls. ("Lieberman Decl."), ECF [18], Ex. C; DeJong Decl. Ex. D; Decl. Michael B. Eisenkraft Supp. SWIB Mot. for Appt. as Lead Pl. ("Eisenkraft Decl."), ECF [24], Ex. A. Accordingly, the PSLRA procedural requirements have been satisfied.

6

2.      *Presumptive Lead Plaintiff*

The CDPQ-Deka Group is the presumptive lead plaintiff because it has the largest financial interest in the litigation and has made a *prima facie* showing of typicality and adequacy.

a.      Largest Financial Interest

The Ninth Circuit has not endorsed any single test to determine which movant has the largest financial interest in an action under the PSLRA. *Cavanaugh*, 306 F.3d at 730 n.4 (noting that "the court may select accounting methods that are both rational and consistently applied."). This Court has primarily used the monetary losses mode of calculation. *See Sigman v. NuScale Power Corp.*, No. 3:23-cv-01689-IM, 2024 WL 727253, at *4 (D. Or. Feb. 22, 2024); *Cannataro v. Portland Gen. Elec. Co.*, No. 3:20-cv-1583-SI, 2020 WL 12800744, at *5 n.5 (D. Or. Nov. 10, 2020); *Deering v. Galena Biopharma, Inc.*, No. 3:14-cv-00367-SI, 2014 WL 4954398, at *8 (D. Or. Oct. 3, 2014). Further, the weight of authority in the Ninth Circuit emphasizes calculating monetary losses on a "last in, first out" ("LIFO") methodology. *Lewis v. CytoDyn, Inc.*, No. C21-5190 BHS, 2021 WL 3709291, at *4 (W.D. Wash. Aug. 19, 2021) (collecting cases) ("The trend among courts nationwide has been to use LIFO in calculating competing movants' estimated losses."); *Malriat v. QuantumScape Corp.*, No. 3:21-cv-00058-WHO, 2021 WL 1550454, at *3 (N.D. Cal. Apr. 20, 2021) (internal quotation marks and citations omitted) ("[T]he weight of authority puts the most emphasis on the competing movants' estimated losses, using a 'last in, first out ("LIFO") methodology.'").

The movants do not dispute that the monetary losses mode of calculation is appropriate here. Based on monetary losses calculated on a LIFO basis, CDPQ-Deka provides evidence that it suffered losses of $93,592,039. DeJong Decl. Ex. A. In a response, the Meitav Group pointed to an error of the classification of one of CDPQ's transactions, and the CDPQ-Deka Group has modified its estimated losses to $96,667,789. Reply Decl. Timothy S. DeJong Further Supp. Mot. for Appt. as Lead Pl. ("DeJong Reply Decl."), ECF [36], Ex. B. The other movants have lower asserted financial interests: SWIB alleges that it suffered losses of $37,137,632, Eisenkraft Decl. Ex. B, and the Meitav Group alleges that it suffered losses of $26,575,298, Lieberman Decl. Ex. A. Accordingly, the CDPQ-Deka Group is the movant with the

7

largest financial stake in this matter.

    b.  Typicality and Adequacy

    To evaluate the CDPQ-Deka Group's *prima facie* case of typicality and adequacy, the Court "must rely on the presumptive lead plaintiff's complaint and sworn certification[.]" *Cavanaugh*, 306 F.3d at 730. At this step, "there is no adversary process to test the substance of [the presumptive lead plaintiff's] claims." *Id.*

    The CDPQ-Deka Group satisfies the typicality requirement. To determine typicality, a court considers "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Sigman*, 2024 WL 727253, at *3 (quoting *A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 839 (9th Cir. 2022)) (internal quotation marks omitted). Here, the CDPQ-Deka Group alleges that like the rest of the class members, it purchased Nike Class B common stock during the Class Period in reliance on defendants' false and misleading representations and that it sustained monetary damages as a result. *See* CDPQ-Deka Grp. Mot. 10; CDPQ-Deka Grp. Resp. 8. Thus, its injury is of the same kind, and arises out of the same facts, as that of other class members.

    The CDPQ-Deka Group also satisfies the adequacy requirement. To determine adequacy, a court considers whether "the movant and its counsel have any conflicts of interest with other class members" and whether "the movant and its counsel [will] prosecute the action vigorously on behalf of the class[.]" *Mersho*, 6 F.4th at 899-900 (internal quotation marks and citation omitted). Here, the CDPQ-Deka Group has certified that there is no conflict between its interests and those of the absent class members, and it has "timely mov[ed] to be appointed as lead plaintiff, timely fil[ed] the requisite certifications, and select[ed] qualified proposed lead and liaison counsel[.]" *Cannataro*, 2020 WL 12800744, at *5; *see* CDPQ-Deka Group Mot. 10-11. Moreover, CDPQ and Deka's experience as institutional investors and as lead or co-lead plaintiffs in securities class actions suggest that they will prosecute the action vigorously on behalf of the class. *See* DeJong Decl. Ex. D, ¶ 4; *Weston v. DocuSign, Inc.*, No. 22-cv-00824-WHO, 2022 WL 1301770, at *3 (N.D. Cal. Apr. 18, 2022). CDPQ and Deka have

stated that based on their past experience, they "have established procedures for overseeing the progress of the litigation and communicating both separate and apart from and with counsel as necessary" and "will . . . confer with and without counsel to ensure that [they] are able to make timely decisions and . . . resolve any disagreement regarding the prosecution of the Action." DeJong Decl. Ex. D, ¶ 9. Lastly, the group's small size—two entities—also supports CDPQ and Deka's belief that they will be able to work together to adequately represent the class.

Because the CDPQ-Deka Group has the greatest financial interest in the outcome of this case and has made a *prima facie* showing of adequacy and typicality, it is the presumptively most adequate plaintiff.

3. *Challenges to the CDPQ-Deka Group's Status as Lead Plaintiff*

At this step, the process "turns adversarial." *Mersho*, 6 F.4th at 899 (quoting *Cavanaugh*, 306 F.3d at 730) (internal quotation marks omitted). The presumption in favor of the CDPQ-Deka Group may be rebutted "only upon proof by a member of the purported plaintiff class that the [CDPQ-Deka Group] will not fairly and adequately protect the interests of the class; or is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *See id.* (quoting 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)) (internal alteration and quotation marks omitted).

The Meitav Group challenges the CDPQ-Deka Group's presumptive appointment as lead plaintiff on two grounds: (1) the CDPQ-Deka Group's initial motion papers contain errors that raise questions as to its adequacy to serve as lead plaintiff, and (2) Deka is subject to a unique defense because it lacks standing. The Court finds that the Meitav Group fails to present sufficient proof on either challenge to rebut the presumption in favor of the CDPQ-Deka Group.

a. Errors in Motion Papers

First, the Meitav Group argues that Deka's motion papers indicate that 11,778 shares of Nike stock were transferred into three Deka accounts through four transactions during the Class Period, but that Deka provides no information regarding the dates on which these shares were originally purchased, or at what prices, thereby making it impossible to assess the accuracy of Deka's submissions. The Meitav

9

Group also argues that CDPQ's motion papers inconsistently record a transaction involving 100,000 shares of Nike stock as a sale in its Certification and as a transfer in its damages analysis.

These contentions are unconvincing. With respect to Deka's transfers, as Deka argues, the Accounting Standards Codification ("ASC") provides that where "an investing party (1) acquires an asset via transfer, and (2) assumes control of that asset from the transferor, such transfer can and should be treated as a purchase by the transferee and recorded at fair market value." CDPQ-Deka Grp. Reply 6 (citing ASC 860-10-40-5; 860-20-25-3; 860-20-30-2). Federal securities law also includes transfers within the definitions of the terms "buy" and "purchase." 15 U.S.C. § 78c(a)(13). Accordingly, Deka appears to have properly treated such transfers as purchases in the loss analysis, identified the date for each transfer in the filing documents, and listed the market price on the date of the transfer.

With respect to the error in CDPQ's claimed losses, multiple district courts have held that "minor or inadvertent mistakes made in a sworn certification do not strike at the heart of Rule 23's adequacy requirement." *In re Solar City Corp. Secs. Litig.*, No. 16-CV-04686-LHK, 2017 WL 363274, at *6 (N.D. Cal. Jan. 25, 2017) (quoting *Niederklein v. PCS Edventures!.com, Inc.*, No. 1:10-cv-00479-EJL-CWD, 2011 WL 759553, at *11 (D. Idaho Feb. 24, 2011)) (internal quotation marks omitted); *see Tai Jan Bao v. SolarCity Corp.*, No. 14-cv-01435-BLF, 2014 WL 3945879, at *4 (N.D. Cal. Aug. 11, 2014) (finding presumptive lead plaintiff adequate and typical despite error in claimed losses); *In re Advanced Tissue Scis. Secs. Litig.*, 184 F.R.D. 346, 351 n.12 (S.D. Cal. 1998) ("The Court . . . does not find the [presumptive lead plaintiff]'s computational and typographical errors to be so substantial as to overcome the statutory presumption in favor of the [presumptive lead plaintiff].").

The Meitav Group argues that CDPQ's error is significant and offers multiple cases for the proposition that district courts have disqualified lead plaintiff movants for significant errors in motion papers. *See Rodriguez v. DraftKings Inc.*, No. 21 Civ. 5739 (PAE), 2021 WL 5282006, at *9 (S.D.N.Y. Nov. 12, 2021) (quoting *Plaut v. Goldman Sachs Grp., Inc.*, No. 18 Civ. 12084 (VSB), 2019 WL 4512774, at *5 (S.D.N.Y. Sept. 19, 2019)) (holding that "errors . . . call[] into doubt [a movant's] adequacy to be lead plaintiff."); *In re Boeing Co. Aircraft Secs. Litig.*, No. 19-cv-02394, 2020 WL 476658, at *5 (N.D. Ill. Jan.

10

28, 2020) (collecting cases); *Camp v. Qualcomm, Inc.*, No. 18-cv-1208-AJB-BLM, 2019 WL 277360, at *3-4 (S.D. Cal. Jan. 22, 2019); *In re Vonage Initial Pub. Offering Secs. Litig.*, No. 07-177 (FLW), 2007 WL 2683636, at *7-8 & n.8 (D.N.J. Sept. 7, 2007). However, in each of those cases, the court rejected the movant because the movant made significant and repeated errors, engaged in gamesmanship, or raised other concerns. *See Rodriguez*, 2021 WL 5282006, at *5 (rejecting movant that "overstate[d] and cloud[ed] losses by omitting (1) profits from options transactions, (2) millions of dollars' worth of [relevant security] trades, and (3) short selling activity."); *Boeing*, 2020 WL 476658, at *5 (rejecting movant that filed initial motion papers with several significant errors, including failing to disclose $7.5 million in relevant sales and the fact that relevant securities were bought on margin); *Plaut*, 2019 WL 4512774, at *5 (rejecting movant for omitting several relevant transactions in its motion papers and filing an amended complaint after the deadline for motions to serve as lead plaintiff in an apparent attempt to manipulate the size of its financial loss); *Camp*, 2019 WL 277360, at *3-4 (internal quotation marks omitted) (rejecting movant because of questions surrounding his typicality and significant errors in filings, including signing under penalty of perjury that he "reviewed the complaint and authorized its filing" but there was no filing made on his behalf, claiming to have purchased shares at a price that was "not within the daily low or high trading prices for . . . that day[,]" and using the wrong loss calculation); *Vonage*, 2007 WL 2683636, at *8 (rejecting movant that signed certification based on direct solicitation from law firm without ever speaking to lawyers and filed facially incorrect certification with several serious errors, including falsely stating that movant had reviewed the relevant complaint).

    Here, the single error made when transposing the transactions from CDPQ's custodial records to the filing documents is not sufficient proof to rebut the CDPQ-Deka Group's status as presumptive lead plaintiff. The fact that this error caused the CDPQ-Deka Group to misstate its losses by over $3 million is troubling. However, unlike the significant and repeated errors in the cases cited by the Meitav Group, the CDPQ-Deka Group's error was clearly inadvertent and will not "infect the claims of the class as a whole." *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 538-39 (S.D.N.Y. 2015) (quoting *Dubin v. Miller*, 132 F.R.D. 269, 272 (D. Colo. 1990)) (internal quotation marks omitted) ("The

11

failure to correct obvious or inconsequential clerical errors . . . simply is not the type of adequacy issue that would 'divert the fact finders' attention from the merits and thus infect the claims of the class as a whole.'"). Accordingly, the Meitav Group has not provided sufficient proof that the CDPQ-Deka Group will not fairly and adequately protect the interests of the class to rebut the presumption.

        b.        Deka's Standing

Second, the Meitav Group argues that Deka is further disqualified because it is subject to unique defenses regarding its standing to pursue fraud claims in this litigation that render it incapable of adequately representing the class.

This contention also fails. As an initial matter, it is undisputed that Deka is not the beneficial owner of the securities at issue; the forty-two Deka funds are. Therefore, to establish standing, Deka must demonstrate that the prudential exception to the injury-in-fact requirement applies.

In *W.R. Huff Asset Management Co. v. Deloitte & Touche LLP*, the Second Circuit recognized a prudential exception to the injury-in-fact requirement, stating that a plaintiff could assert third-party standing upon showing "(1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests." 549 F.3d 100, 109 (2d Cir 2008) (citations omitted). "Courts routinely recognize the [prudential] exception" when presented with facts similar to those in this case. *Weston*, 2022 WL 1301770, at *4. For example, in *Weston*, the court held that Deka International S.A. Luxembourg ("DIL") had standing to sue because it had the exclusive statutory right to bring legal claims to recover losses incurred by the funds which, under the laws of Luxembourg, did not have legal authority to pursue such claims on their own. *Id.* at *5. Similarly, in *In re Vivendi Universal, S.A. Securities Litigation*, the court held that German management companies, including Deka Investment and Deka Fundmaster, had standing to sue because their relationship to the funds was akin to that of a trustee to beneficiary, and because the funds did not have legal personality and thus could not bring suit on their own. 605 F. Supp. 2d 570, 577-78 (S.D.N.Y. 2009). The court also noted that German law granted the German investment companies "exclusive authority to sue on behalf of the funds." *Id.* at 578.

The Meitav Group argues that Deka never explicitly invoked the prudential exception in

its motion, and that by invoking the exception in its reply, Deka has effectively conceded the insufficiency of its initial standing proffer. The Court finds that Deka did not need to explicitly invoke the prudential exception in its motion in so many words. The prudential exception applies if Deka alleged sufficient facts to "demonstrate (1) a close relationship to the injured part[ies]"—i.e., the forty-two Deka funds—"and (2) a barrier to the injured part[ies'] ability to assert [their] own interests." *Huff*, 549 F.3d at 109 (citations omitted). The Court will also consider the additional assertions about Deka's standing offered in the CDPQ-Deka Group's reply. Although a plaintiff's standing is assessed at the outset of litigation, as the Meitav Group correctly states, neither the factual nor legal bases of Deka's standing have changed between the time the CDPQ-Deka Group filed its initial motion and its reply. *See City of Taylor Police & Fire Ret. Sys. v. W. Union Co.*, No. 13-cv-03325-MSK-MJW, 2014 WL 4799659, at \*5 (D. Colo. Sept. 26, 2014). Moreover, the Court will not disregard the CDPQ-Deka Group's presumptive status as lead plaintiff simply because Deka failed to anticipate that the Meitav Group would object to its standing. *See id.* Indeed, Deka might have reasonably believed that a case like *Vivendi*, which analyzed the question of Deka's standing fifteen years ago, put this issue to rest. *See id.*

The Meitav Group also argues that because Article III standing is a question of U.S. law, Deka's attestations about German law are "beside the point." Meitav Grp. Resp. 21. This argument is not well taken. Courts frequently consider declarations on foreign law governing the structure of foreign entities when determining whether those entities have standing to sue. *See, e.g.*, *Vivendi*, 605 F. Supp. 2d at 577-78; *Weston*, 2022 WL 1301770, at \*5. This Court will likewise consider the declarations that Deka has offered regarding Deka's structure as an investment manager organized under German law.

Finally, the Meitav Group argues that the substance of Deka's reply is still insufficient to establish that the prudential exception applies. The Meitav Group argues that the Court should follow the reasoning in *Gross v. AT&T, Inc.*, in which the court did not appoint KBC Asset Management NV ("KBC"), a European asset manager, as lead plaintiff and denied KBC's motion for reconsideration. No. 19-CV-2892 (VEC), 2019 WL 3500496, at \*3 (S.D.N.Y. July 31, 2019). There, the court held that KBC failed to establish its standing at the outset of the case and such failure made KBC "subject to a unique standing

13

defense." *Id.* at *1, 3-4. The court noted that even with an additional proffer of a declaration by a Belgian legal expert and management agreements—which the CDPQ-Deka Group has not provided in this case— "KBC face[d] a non-speculative risk that [the d]efendants may succeed in mounting a standing challenge, possibly premised on foreign law; the possibility of that defense, at minimum, significantly detracts from KBC's ability to represent the putative class." *Id.* at *3. This was because none of the declarations or management agreements "confer[red] on KBC any type of property right in legal claims" and because neither the management agreements nor Belgian law "prevent[ed] the Funds from exercising their rights directly[.]" *Id.*

However, *Gross* is clearly distinguishable from the instant case. Unlike in *Gross*, where the asset manager did not establish the existence of its property right under either the management agreements or Belgian law and there was no barrier to the funds' ability to assert their own interests, here, Deka has demonstrated both a close relationship to its funds and a barrier to the funds' ability to assert their own interests. Deka is organized as a Kapitalverwaltungsgesellschaft ("KVG") under German law and makes investments for the benefit of third parties. DeJong Reply Decl. Ex. A, ¶ 10. KVGs create and manage investment funds, and the funds themselves are not legal entities. *Id.* Deka has stated that "[a]lthough the KVG makes investment decisions for the benefit of the funds, the funds and their investors cannot transfer or otherwise dispose of the investments itself. When these investments lose value, the relevant funds are harmed directly." *Id.* Deka has also stated that under German law, "[t]he [Deka funds] have no legal authority . . . to pursue claims on their own," DeJong Decl. Ex. D, ¶ 2, and "Deka, as the KVG, has the exclusive authority and obligation to bring claims in this action on behalf of the [Deka] funds," DeJong Reply Decl. Ex. A, ¶ 13. Therefore, Deka argues that it "requires no assignment of claims from the funds it manages[.]" DeJong Decl. Ex. D, ¶ 2. As the courts recognized in *Vivendi* and *Weston*, Deka and the Deka funds have a sufficiently close relationship because the Deka funds are not legal entities under German law and cannot themselves control investments. *See* 605 F. Supp. 2d at 578; 2022 WL 1301770, at *5. The Deka funds depend on Deka to invest assets into the funds and assert legal claims arising from those investments. Additionally, like the funds in *Vivendi* and *Weston*, the Deka funds are

14

apparently barred from bringing claims on their own behalf under German law. *See* 605 F. Supp. 2d at 578; 2022 WL 1301770, at *5.

For the foregoing reasons, the Court finds that the Meitav Group's concerns about Deka's standing are speculative at best. On the record currently before the Court, Deka appears to fit comfortably within *Huff*'s prudential exception. And given *Huff*'s application in similar circumstances, it is not certain that Deka will face a challenge to standing. *See Weston*, 2022 WL 1301770, at *5. Accordingly, the Meitav Group has not proffered sufficient proof that the CDPQ-Deka Group is subject to this "unique defense" to rebut the presumption.[1] *See Mersho*, 6 F.4th at 901-02 (quoting *Cavanaugh*, 306 F.3d at 733) (alteration in original) ("Misgivings are not evidence that cast 'genuine and serious doubt on [the] plaintiff's willingness or ability to perform the functions of lead plaintiff.'").

Because the Meitav Group has not rebutted the presumption that the CDPQ-Deka Group should be the lead plaintiff, the Court appoints the CDPQ-Deka Group as lead plaintiff.

**B.    Approval of Lead and Liaison Counsel**

The CDPQ-Deka Group has selected Labaton Keller Sucharow LLP ("Labaton") as lead counsel and Stoll Stoll Berne Lokting & Shlachter P.C. ("Stoll Berne") as liaison counsel. Those choices are entitled to substantial deference. *See Cohen*, 586 F.3d at 712. Both law firms have extensive experience in prosecuting securities class actions. *See* DeJong Decl. Exs. E, F. Accordingly, the Court approves the CDPQ-Deka Group's selection of Labaton as lead counsel and Stoll Berne as liaison counsel.

---

[1] The Meitav Group does not challenge CDPQ's standing but argues that because Deka's standing issues threaten complete dismissal of the class's claims, the CDPQ-Deka Group is disqualified. *See* Sur-Reply Mem. of L., ECF [40-1], at 5. However, even if it were later determined that Deka in fact lacked standing, CDPQ may still proceed as lead plaintiff. CDPQ alone claims approximately $81,047,953 in losses—far more than SWIB or the Meitav Group. *See* DeJong Reply Decl. Ex. B. The other requirements would also be satisfied. Accordingly, the Meitav Group's suggestion "that a group rises and falls as a group and should not be allowed to segment is not supported by [] case law." *Mannkind Secs. Actions*, No. CV 11–00929 GAF (SSx), 2011 WL 13218021, at *4 (C.D. Cal. Apr. 27, 2011) (quoting *In re Surebeam Corp. Secs. Litig.*, No. 03 CV 1721JM(POR), 2004 WL 5159061, at *7 (S.D. Cal. Jan. 5, 2004)) (alteration in original and internal quotation marks omitted); *see Weston*, 2022 WL 1301770, at *5 n.3 (citing *Surebeam*, 2004 WL 5159061, at *7) ("[C]ase law does not expressly foreclose the possibility that [Deka] could be severed.").

## CONCLUSION

For the foregoing reasons, the CDPQ-Deka Group's Motion for Appointment as Lead Plaintiff, ECF [19], is GRANTED. The Meitav Group's Motion for Appointment as Lead Plaintiff, ECF [17], C+F-Universal Group's Motion for Appointment as Lead Plaintiff, ECF [21], and SWIB's Motion for Appointment as Lead Plaintiff, ECF [23], are DENIED. The CDPQ-Deka Group is APPOINTED as lead plaintiff, and its selection of Labaton as lead counsel and Stoll Berne as liaison counsel is APPROVED.

IT IS SO ORDERED.

DATED this 25th day of October, 2024.

_____
Adrienne Nelson
United States District Judge