STOEL RIVES LLP
B. JOHN CASEY, Bar No. 120025
john.casey@stoel.com
ALEX VAN RYSSELBERGHE, Bar No. 174836
alex.vanrysselberghe@stoel.com
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  503.224.3380
Facsimile:  503.220.2480

GIBSON, DUNN & CRUTCHER LLP
BRIAN M. LUTZ *(Pro Hac Vice)*
blutz@gibsondunn.com
One Embarcadero Center Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8379
Facsimile: 415.374.8474

JESSICA VALENZUELA *(Pro Hac Vice)*
jvalenzuela@gibsondunn.com
JEFF LOMBARD *(Pro Hac Vice)*
jlombard@gibsondunn.com
310 University Avenue
Palo Alto, CA 94301-1744
Telephone: 650.849.5340

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| IN RE NIKE, INC. SECURITIES LITIGATION | Case No. 3:24-cv-00974-AN<br><br>DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>Judge:  Hon. Adrienne Nelson |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 3

    I.    Plaintiffs Do Not Identify a Single False or Misleading Statement...................... 3

        A.    Plaintiffs point to no facts showing NIKE's CDA strategy statements were untrue............................................................ 4

        B.    Plaintiffs point to no facts showing that NIKE's supply chain statements were untrue............................................................ 8

        C.    Plaintiffs point to no facts showing that NIKE's technology statements were untrue............................................................ 10

        D.    Plaintiffs point to no facts showing that NIKE's product innovation statements were untrue............................................................ 13

        E.    Plaintiffs point to no facts showing that NIKE's product category statements were untrue............................................................ 16

        F.    Plaintiffs point to no facts showing that NIKE's competition statements were untrue............................................................ 16

    II.    Plaintiffs Fail to Plead a Strong Inference of Scienter......................................... 19

        A.    Plaintiffs allege no facts to show Defendants' knowledge of falsity....... 19

        B.    Plaintiffs fail to allege scienter through executive departures and stock sales. ............................................................ 23

        C.    The competing non-fraudulent inference is far more compelling. .......... 25

CONCLUSION...................................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Accuray, Inc. Sec. Litig.*,
757 F. Supp. 2d 936 (N.D. Cal. 2010) ...................................................................13

*In re Allaire Corp. Sec. Litig.*,
224 F. Supp. 2d 319 (D. Mass. 2002) ...................................................................17

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ...................................................................................13

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ..............................................................................................10

*AMI - Gov't Emps. Provident Fund Mgmt. Co. Ltd. v. Alphabet Inc.*,
2024 WL 4353637 (N.D. Cal. Sept. 3, 2024) ..........................................................6

*Bodri v. GoPro, Inc.*,
252 F. Supp. 3d 912 (N.D. Cal. 2017) ...................................................................20

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ............................................................................8, 10

*Chang v. Accelerate Diagnostics, Inc.*,
2016 WL 3640023 (D. Ariz. Jan. 28, 2016) ..........................................................10

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) .............................................................................6, 7

*In re Cloudera, Inc.*,
121 F.4th 1180 (9th Cir. 2024) .........................................................................4, 16

*In re Cloudera, Inc.*,
2021 WL 2115303 (N.D. Cal. May 25, 2021) ..........................................................7

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991) .................................................................................10

*Costanzo v. DXC Tech. Co.*,
2021 WL 5908385 (N.D. Cal. Dec. 14, 2021) ..........................................................5

*Dolly v. GitLab Inc.*,
2025 WL 2372965 (N.D. Cal. Aug. 14, 2025) ......................................................17

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) .................................................................................20

*In re Eargo, Inc. Sec. Litig.*,
2023 WL 5663154 (N.D. Cal. Aug. 31, 2023) ......................................................25

*In re Facebook, Inc. Sec. Litig.*,
  87 F.4th 934 (9th Cir. 2023) .......................................................................................13

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)..........................................................................25

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ...................................................................................8, 18

*Hayden v. Portola Pharms., Inc.*,
  2021 WL 3506614 (N.D. Cal. Aug. 10, 2021), *abrogated on other grounds by
  Hayden v. Portola Pharms., Inc.*, 2022 WL 4374962 (N.D. Cal. Jan. 20, 2022)...................22

*HRSA-ILA Funds v. Adidas AG*,
  745 F. Supp. 3d 1127 (D. Or. 2024) ............................................................................12

*Joyce v. Amazon.com Inc.*,
  2025 WL 835054 (W.D. Wash. Mar. 17, 2025) ...........................................................24

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
  19 F.4th 601 (4th Cir. 2021) ........................................................................................22

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) .........................................................................................5

*Lilien v. Olaplex Holdings, Inc.*,
  765 F. Supp. 3d 993 (C.D. Cal. 2025) ....................................................................15, 18

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) .....................................................................................10

*Lomingkit v. Apollo Educ. Grp. Inc.*,
  2017 WL 633148 (D. Ariz. Feb. 16, 2017)..................................................................16

*In re Lyft Inc. Sec. Litig.*,
  484 F. Supp. 3d 758 (N.D. Cal. 2020) .........................................................................18

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024)........................................................................................................8

*Mallen v. Alphatec Holdings, Inc.*,
  861 F. Supp. 2d 1111 (S.D. Cal. 2012)........................................................................24

*Metzler Inv. GMBH v. Corinthian Coll., Inc.*,
  540 F.3d 1049 (9th Cir. 2008) .....................................................................................24

*In re NVIDIA Corp. Sec. Litig.*,
  2011 WL 4831192 (N.D. Cal. Oct. 12, 2011), *aff'd*, 768 F.3d 1046 (9th Cir.
  2014) .............................................................................................................................21

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*,
  2021 WL 3748325 (N.D. Cal. Aug. 24, 2021) ............................................................14

*Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pension Fund*,
   575 U.S. 175 (2015) ..................................................................................................2, 8

*Petersen v. Stem, Inc.*,
   2024 WL 4602710 (N.D. Cal. Aug. 30, 2024) .......................................................1, 3, 13, 20

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
   45 F.4th 1236 (10th Cir. 2022) ..............................................................................18

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ...............................................................................3

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ...............................................................................10

*In re Quality Systems, Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ...........................................................................15, 20

*In re Rackable Sys., Inc. Sec. Litig.*,
   2010 WL 3447857 (N.D. Cal. Aug. 27, 2010) ......................................................6

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) ...............................................................................15

*Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*,
   2025 WL 1900722 (N.D. Cal. July 9, 2025)......................................................7, 22

*Robb v. Fitbit, Inc.*,
   216 F. Supp. 3d 1017 (N.D. Cal. 2016) ............................................................7, 12

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ..............................................................................1, 21

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) .................................................................................9

*Shnayder v. Allbirds, Inc.*,
   2025 WL 1745596 (N.D. Cal. June 23, 2025) ......................................................23

*Shuster v. Symmetricon, Inc.*,
   1997 WL 269490 (N.D. Cal. Feb. 25, 1997) ........................................................12

*Siegel v. Lyons*,
   1996 WL 438793 (N.D. Cal. Apr. 26, 1996) ........................................................5

*Sigman v. NuScale Power Corp.*,
   2025 WL 1455432 (D. Or. May 21, 2025) .......................................................7, 10

*In re Silicon Graphics Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999), *superseded by statute on other grounds* ................25

*In re Silicon Graphics Inc. Sec. Litig.*,
   970 F. Supp. 746 (N.D. Cal. 1997) ......................................................................20

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019) ................................................................................................. 8, 10

*Sinnathurai v. Novavax, Inc.*,
  645 F. Supp. 3d 495 (D. Md. 2022) ......................................................................................... 9

*In re Snap Inc. Sec. Litig.*,
  2018 WL 2972528 (C.D. Cal. Jun. 7, 2018) .......................................................................... 18

*In re Splunk Inc. Sec. Litig.*,
  592 F. Supp. 3d 919 (N.D. Cal 2022) ..................................................................................... 14

*In re Swift Transp. Co., Inc.*,
  2006 WL 1805578 (D. Ariz. Mar. 29, 2006) ......................................................................... 16

*Sylebra Cap. Partners Master Fund Ltd. v. Everbridge, Inc.*,
  2025 WL 1938359 (9th Cir. July 15, 2025) ..................................................................... 21, 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................................................................................... 2, 19

*In re UiPath, Inc. Sec. Litig.*,
  2025 WL 2065093 (S.D.N.Y. July 23, 2025) ......................................................................... 23

*In re Unity Software, Inc. Sec. Litig.*,
  2025 WL 1387952 (N.D. Cal. Mar. 12, 2025) ......................................................................... 7

*Weston Family P'ship v. Twitter, Inc.*,
  29 F.4th 611 (9th Cir. 2022) ..................................................................................................... 6

*In re Wet Seal, Inc. Sec. Litig.*,
  518 F. Supp. 2d 1148 (C.D. Cal. 2007) ................................................................................. 16

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) ................................................................................................ 14

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) .............................................................................................. 5, 24

# INTRODUCTION[1]

Plaintiffs' opposition fails to make sense of their sprawling 819-paragraph Second Amended Complaint ("SAC") and confirms that dismissal is proper here. Plaintiffs make no attempt to explain why any challenged statement was false when made, to tie any alleged "fact" to any challenged statement, or to connect any speaker of a challenged statement to knowledge of the so-called "truth." Rather, Plaintiffs' opposition is filled with conclusory arguments untethered to specific facts—sometimes citing to 40-paragraph chunks of the SAC (*see* Opp. 17, 21, 23)—which underscore Plaintiffs' failure to plead falsity or scienter with particularity. The SAC is precisely the type of scattershot pleading that falls well short of the PSLRA's rigorous pleading requirements. *See Petersen v. Stem, Inc.*, 2024 WL 4602710, at *4–5 (N.D. Cal. Aug. 30, 2024).

As to the falsity element, Plaintiffs mischaracterize their burden. They suggest that the PSLRA's exacting standard is little more than a "reasonable inference standard of plausibility" and that dismissal is proper "only if reasonable minds could not disagree" about falsity. Opp. 5. That is wrong. The PSLRA requires *specific, contemporaneous facts* demonstrating *why* the alleged misstatements were false or misleading *when made*. *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001). The SAC offers none of this. Instead, Plaintiffs point in their opposition to subjective and vague observations from former NIKE employees who second-guess NIKE's corporate strategy and gripe about "operational problems" unrelated to any challenged statement. Plaintiffs also misleadingly cherry-pick quotes and ask the Court to ignore the context in which those statements were made, but Supreme Court precedent is clear that statements *must* be read in

---

[1] All capitalized terms, unless defined herein, have the same definition as in the Motion. Citations to "¶ __" or "¶¶ __" are to paragraphs in the Second Amended Complaint. Unless otherwise stated, all emphasis is added, and all internal quotations and citations are omitted.

context to determine whether a challenged statement is false or misleading. *Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pension Fund*, 575 U.S. 175, 190 (2015).

Plaintiffs' core claim is that Defendants lied to NIKE's investors by saying that NIKE's CDA strategy "was working" when it was purportedly "plagued by severe problems." Opp. 1. But Plaintiffs cannot square this theory with the undisputed fact that *NIKE's digital and direct revenues achieved record highs under CDA*. At the same time, NIKE never promised flawless execution or suggested to investors that its multi-billion-dollar effort to transform the Company into a digital-first enterprise was without challenges. NIKE was not required to give investors a play-by-play of every internal discussion nor was it required to disclose every challenge the company faced throughout this multi-year strategy.

Plaintiffs fare no better with the difficult-to-plead scienter element. The opposition does not explain why each of NIKE's senior-most executives would perpetrate a years-long fraud while investing billions of dollars in the very strategy they supposedly knew was doomed to fail. Instead, Plaintiffs improperly lump all Defendants into a single group and cobble together allegations attributed to CWs—most of whom had no interaction with Defendants—and speculate about illicit motives based on ordinary stock sales. This is insufficient to plead a strong inference that any Defendant intended to deceive investors. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The most compelling inference—indeed the only cogent one—is that Defendants pursued CDA because they believed it would benefit NIKE (as it unquestionably did for years), invested significant resources to make the strategy successful, and pivoted when market dynamics shifted and CDA's progress plateaued.

Plaintiffs' hindsight theory that NIKE and its senior officers knew CDA would fail and lied to investors about it for years is unsupported by particularized factual allegations and defies

common sense.  It is implausible that senior executives would supposedly undertake a years-long fraud based on vague statements about being "cool" or "innovative," the Company's organizational structure, or its investment in technology and supply chains—while at the same time providing transparent and accurate disclosures of the concrete financial and business metrics that actually matter to investors.  The very nature of this supposed "fraud" is nonsensical and only underscores that Plaintiffs' sprawling, kitchen-sink pleading should be dismissed in full.

## ARGUMENT

### I.    Plaintiffs Do Not Identify a Single False or Misleading Statement

Rather than explain how any challenged statement was false or misleading when made, Plaintiffs simply incorporate large blocks of "facts" from the SAC and expect the Court to sort out and pair each statement with unspecified "facts."[2]  This puzzle-pleading tactic is at odds with the "exacting pleading requirements" of the PSLRA.  *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc*., 759 F.3d 1051, 1057–58 (9th Cir. 2014).  In the *Petersen* case, as here, plaintiffs set out a litany of alleged false statements in multiple categories and relied "for each category [on] an amalgam of 'reasons' why all statements in the corresponding" category are false, including "cross-references to multiple sections of factual allegations contained elsewhere in the" complaint.  2024 WL 4602710, at *4; *see* Mot. 9–10, n.3.  The court dismissed the complaint in full because plaintiffs merely threw "the statements and the alleged 'true facts' together in an undifferentiated clump" which required "the reader to sort out and pair each statement with a supposedly relevant 'true fact.'"  *Petersen*, 2024 WL 4602710 at *5.  As Plaintiffs' opposition demonstrates, the SAC

---

[2] *See* Opp. 17 (citing ¶¶ 289–328 for the proposition that CDA was "failing"); Opp. 21 (citing ¶¶ 105–42 for the proposition that CDA's success was linked to Plaintiffs' identified components); Opp. 33 (citing ¶¶ 105–42 for the proposition that product innovation was important for NIKE's brand).

PAGE 3 – DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT

does the same thing and should be dismissed in full for this reason alone.

### A.    Plaintiffs point to no facts showing NIKE's CDA strategy statements were untrue.

Plaintiffs challenge statements between March 2021 and June 2023 that CDA "was working" without pleading specific facts showing the strategy was purportedly failing during that time. Plaintiffs' own allegations, however, show that CDA *was* "working," as evidenced by NIKE's strong financial performance for much of the relevant period. Mot. 11. Plaintiffs ignore these metrics and claim the statements were false because "(i) NIKE's CDA *components* were failing," and "(ii) NIKE's growth was driven by other temporary and unrelated factors, not CDA." Opp. 21 (citing ¶¶ 105, 361–88). But Defendants never described CDA as consisting of the "components" Plaintiffs identify, nor did Defendants promise perfect execution of the strategy. From the outset, the Company made clear that CDA was the next phase of its prior DTC strategy with a sharpened focus on digital. *See* Ex. 5 at 3–6; ¶¶ 95–98. NIKE told investors that it would invest in CDA by scaling digitally enabled mono-brand stores, reorganizing around simpler consumer constructs (*i.e.*, Men's, Women's, and Kids') while remaining rooted in the power of sport, and developing end-to-end digital capabilities. ¶¶ 95–98. Plaintiffs' attempt to repackage CDA as a set of rigid "components" that supposedly were not working perfectly, Opp. 21–22, is unsupported by the record and does not support a securities fraud claim. *See In re Cloudera, Inc.*, 121 F.4th 1180, 1188–89 (9th Cir. 2024) (affirming dismissal for failure to plead falsity where the "challenged statements lack a plain or ordinary meaning" and plaintiff failed "to 'plead facts' supporting his definitions of those terms.").

Nor do Plaintiffs get anywhere by attributing NIKE's undeniable growth and success for

much of the Class Period to "other fleeting factors," as opposed to CDA.[3] Opp. 22–23. But insofar as Plaintiffs' claim that these "fleeting factors" were associated with the COVID pandemic, NIKE never said otherwise. Indeed, on June 25, 2020—the day CDA was announced—Defendants explained that the strategy arose from the Company's rapid digital growth that had been supercharged by the pandemic. Ex. 5 at 2; *Siegel v. Lyons*, 1996 WL 438793, at *4 (N.D. Cal. Apr. 26, 1996) ("where SEC filings actually disclose allegedly omitted information, dismissal of a claim premised upon nondisclosure is proper.").

Plaintiffs rely on vague CW allegations about missed revenue targets throughout the Class Period to suggest that CDA was broken even as the Company was experiencing strong results.[4] Opp. 23–24. But Plaintiffs do not plead what the internal revenue targets were, who set them, or the extent to which NIKE missed its targets. *Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 991–92 (9th Cir. 2009) ("[T]o properly allege falsity, a securities fraud complaint must . . . state with particularity all facts on which that belief is formed."). Indeed, NIKE consistently met or exceeded its guidance to investors when it told them that CDA was "working." *See* Mot. 2, 11. And even if NIKE had missed internal targets, as Plaintiffs claim, that does not mean CDA was failing. *Costanzo v. DXC Tech. Co.*, 2021 WL 5908385, at *4 (N.D. Cal. Dec. 14, 2021) ("A

---

[3] Plaintiffs argue that Defendants improperly rely on incorporated documents to dispute facts alleged in the complaint, *see* Opp. 22 n.18, but this is a nonstarter because Plaintiffs did not oppose Defendants' Request for Judicial Notice, Dkt. 67 and thus waived any argument that the Court cannot consider the exhibits, Dkts. 68-1–68-22, submitted in support of Defendants' motion to dismiss. In any event, Defendants' exhibits do not dispute any well-pled fact—Plaintiffs nowhere allege in the SAC that NIKE's digital and direct revenues did not achieve record highs under CDA. *Cf. Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002–03 (9th Cir. 2018) (striking certain documents submitted by defendants that "did not form the basis of any claim in the Complaint" and contradicted plaintiffs' allegations about study results).

[4] CW-4 does not allege *when* during her tenure (*i.e.*, March 2022–April 2023) this issue was discussed and *how* this contradicts any of Defendants' public statements that CDA was "working" between October 2021 and June 2023. *See* Opp. 23; ¶ 390.

company can have an ambitious internal target and disclose publicly that it expects to meet a more modest target without misleading investors. Finding otherwise would deny companies an important tool in their motivational arsenal—using an optimistic goal internally to ensure they can meet more modest publicly disclosed expectations."). NIKE had no duty to disclose internal misses absent any allegation that such "misses" were inconsistent with anything NIKE said publicly. *See, e.g.*, *Weston Family P'ship v. Twitter, Inc*., 29 F.4th 611, 621 (9th Cir. 2022) (no duty to disclose "software bugs" when stating that its overall program was "on track"). Nor do generalized allegations of internal challenges contradict public statements that CDA was, in fact, driving growth. Specifically, in a large and complex business such as NIKE, slow progress, Opp. 9, amounts to "problems and difficulties [that] are the daily work of business people" and does not indicate that public statements regarding strategy are a lie. *See, e.g.*, *In re Rackable Sys., Inc. Sec. Litig*., 2010 WL 3447857, at *5 (N.D. Cal. Aug. 27, 2010) ("The shortcomings in the execution of [Rackable's] strategy do not mean that, at the time the strategy was made, Rackable had no reason to believe that it could be effective.").

Moreover, Defendants' statements that CDA was "working" were statements of opinion and corporate optimism, neither of which is actionable. Mot. 13. Plaintiffs contend that Defendants' statements were not opinions because they lacked qualifiers such as "I think." Opp. 24. This is not the law: "[N]ot all statements of opinion include such qualifying language like 'I believe' or 'I think.'" *AMI - Gov't Emps. Provident Fund Mgmt. Co. Ltd. v. Alphabet Inc.*, 2024 WL 4353637, at *3 (N.D. Cal. Sept. 3, 2024). Plaintiffs also argue that, even if they were opinions, they are nonetheless actionable because Defendants purportedly omitted "material facts about the faltering state of CDA." Opp. 24. But Plaintiffs fail to plead any such facts allegedly omitted by Defendants, as set forth *infra* I.B–F. *See City of Dearborn Heights Act 345 Police &*

PAGE 6 – DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT

*Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) ("When a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that the supporting fact the speaker supplied is untrue.") (cleaned up); *In re Unity Software, Inc. Sec. Litig.*, 2025 WL 1387952, at *9–10 (N.D. Cal. Mar. 12, 2025) (rejecting claims that general statements that company's models were "working very well" were misleading based on omission of "generalized allegations referencing 'problems' or 'complaints'").[5]

Plaintiffs also argue that Defendants' statements about the CDA strategy cannot be dismissed as puffery because the question of materiality cannot be resolved on a motion to dismiss. Opp. 25–26. Plaintiffs, again, are wrong on the law. General statements of corporate optimism that are "not capable of objective verification" and "lack a standard against which a reasonable investor could expect them to be pegged" are immaterial as a matter of law, and courts routinely dismiss such statements at the pleadings. *In re Cloudera, Inc.*, 2021 WL 2115303, at *16 (N.D. Cal. May 25, 2021) (cleaned up); *Sigman v. NuScale Power Corp.*, 2025 WL 1455432, at *10–11 (D. Or. May 21, 2025) (statements that conversations with prospective customers were "going quite well" and that progress was "looking pretty good" did not convey any specific facts to be actionable); *Robb v. Fitbit, Inc.*, 216 F. Supp. 3d 1017, 1029 (N.D. Cal. 2016) (statement that defendant is "happy with [his device]" was nonactionable as vague, generalized assertions of corporate optimism "upon which no reasonable investor would rely").

---

[5] Plaintiffs' reliance on *Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc. ("Stitch Fix")*, 2025 WL 1900722, at *7 (N.D. Cal. July 9, 2025), is misplaced. There, the statement that a new product line was "working" was actionable where internal test results showed that the new product line cannibalized new customers from the company's core product. *Stitch Fix*, 2025 WL 1900722, at *6.

PAGE 7 – DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT

**B.    Plaintiffs point to no facts showing that NIKE's supply chain statements were untrue.**

Between March 2021 and April 2023, NIKE told investors that it was creating and building a "digital-first" supply chain.  Mot. 14–15.  The SAC does not allege that NIKE was not doing so, and Plaintiffs do not argue otherwise.  Instead, they argue these statements were purportedly misleading because NIKE concealed that (1) it was not investing in a *separate* DTC supply chain and (2) it was experiencing "operational problems."  Opp. 6–8.  This argument makes little sense.  NIKE never said it was investing in a separate DTC supply chain.  Opp. 8 (*i.e.*, ¶¶ 441, 446, 482, 510).[6]  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (statement not misleading where it "neither stated nor implied anything regarding" the alleged omission).  Nor do routine business challenges with its supply chain contradict NIKE's statements that it was *building* a digital-first supply chain.  *See Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019) (company's "assertion that it expect[s] to continue to allocate significant resources to regulatory compliance suggests a company actively working to improve its compliance efforts, rather than one expressing confidence in their complete (or even substantial) effectiveness").  Plaintiffs' bare assertion that Defendants "omitted facts" is not enough.  *See* Opp. 7, 8; *see also Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024) (Section 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information, even if

---

[6] Plaintiffs assert that Donahoe's statement that NIKE had "fairly impressively *pivot[ed]* to a *more* direct-to-consumer supply chain" (¶ 441) is not puffery because "fairly impressiv[e]" provided "a concrete description of the past and present state" of the supply chain, Opp. 25 (quoting *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770 (9th Cir. 2023)).  But "fairly impressively" does not describe a separate DTC supply chain, especially when NIKE told investors it was doing the opposite.  *See Omnicare*, 575 U.S. at 190 (a reasonable investor reads statements "whether of fact or of opinion, in light of all its surrounding text," so an omission that seems to make a statement misleading "when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame").

"investors would consider the omitted information significant").

Plaintiffs' reliance on *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495 (D. Md. 2022), is misplaced. There, the company told investors that it "got past (certain) supply issues" and all its vaccine manufacturing facilities were already producing at scale, when in fact the company had facilities shut down for contamination, failed to scale up production, and was facing "supply chain disruption." *Id*. at 520–21. No such facts—or statements—are alleged in this case. This case is also unlike *Schueneman v. Arena Pharmaceuticals, Inc*., 840 F.3d 698 (9th Cir. 2016), where the court found a material omission because the company concealed that rats in animal studies developed cancer while touting that its drug was not toxic based on results of those same animal studies. Again, Plaintiffs have not pled any adverse, concealed information that contradicted anything NIKE said about its supply chain.

Specifically as to Defendant Campion, the SAC alleges only one misstatement. Mot. 15 n.5. While the opposition insists Campion misleadingly "tout[ed] NIKE's increased 'digital commerce distribution capability'" in an article, Plaintiffs still make no effort to explain how or why this statement was in any way false (because it was not). Opp. 8. As explained in the opening brief, Plaintiffs also ignore that in the very same interview, Campion cautioned that NIKE's digital supply chain was a work in progress and undergoing a transformation. Mot. 15. This context defeats any claim that Campion made any misstatement and mandates that he be dismissed as a defendant.

Plaintiffs incorrectly characterize this context (and other crucial context around all challenged statements) as a "truth-on-the-market" defense. *See, e.g.*, Opp. 8. This is a red herring. Truth-on-the-market is when investors could not have relied on the misleading statement because the market already was aware of the allegedly omitted information and incorporated it into the

stock price. *Provenz v. Miller*, 102 F.3d 1478, 1492 (9th Cir. 1996); *see, e.g.*, *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir. 1991) (company's omission of decreased sales to a major buyer was not materially misleading because analysts had separately reported on risk to sales). This defense goes to the materiality element—not falsity. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 481 (2013). Here, by contrast, Defendants simply ask the Court to consider whether the challenged statements are misleading when viewed *in context*, which is unquestionably required. *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) (rejecting claim about risk disclosure that "in context" similarly did not mislead); *Chang v. Accelerate Diagnostics, Inc.*, 2016 WL 3640023, at *5 (D. Ariz. Jan. 28, 2016) (granting defendants' motion to dismiss where, as here, "Defendants assert 'that the statements themselves, read in context, are simply not false or misleading.'… This is not a truth-on-the-market defense.").

## C. Plaintiffs point to no facts showing that NIKE's technology statements were untrue.

Plaintiffs do not dispute that NIKE invested in technology and rolled out parts of the Adobe platform in October 2021. Nevertheless, they argue that statements about NIKE's investment in technology and its partnership with Adobe were misleading because NIKE "failed to develop these DTC technological capabilities" and "its technology organization was plagued by dysfunction." Opp. 9–11. But NIKE never said its technology was working perfectly, so it had no duty to disclose every issue NIKE encountered. *Brody*, 280 F.3d at 1006.

Plaintiffs claim that NIKE's statement that its technology investments made NIKE "more agile," ¶ 476, created an impression that "NIKE's DTC technology buildout was progressing successfully." Opp. 10. But NIKE never said it had completed its technology buildout, nor did it promise a timeline for doing so. *See Singh*, 918 F.3d at 64; *Sigman*, 2025 WL 1455432, *12

(company's optimistic statements about on-going project did not guarantee ultimate success of that project).  While Plaintiffs continue to focus on a conspiratorial narrative about how a "shadow team" created by NIKE's former Chief Digital Information Officer brought "dysfunction and corruption in NIKE's technology group," Plaintiffs never explain how these allegations make any of the challenged statements false or misleading.  Opp. 11.

Plaintiffs' arguments about NIKE's partnership with Adobe suffers similar defects. Plaintiffs claim that because NIKE discussed "new capabilities activated in partnership with Adobe," ¶ 518, and stated that Adobe "played such an important role of delivering a more personalized experience" for its consumers, ¶ 504,[7] NIKE had a duty to disclose "[t]he Adobe partnership failures."  Opp. 10.  But Plaintiffs misconstrue NIKE's statements about the *potential* of the Adobe partnership as definitive statements of then-current success.  *See, e.g.*, ¶ 518 (statement in June 2022 that NIKE "started testing" new capabilities activated in partnership with Adobe); *see also* ¶ 579 (statement on June 2023 that NIKE was "only beginning to operationalize these capabilities and consumer experiences on digital platforms" unlocked by the Adobe partnership).

Plaintiffs misrepresent the court's finding in *Robb*, claiming that decision holds that "dedicat[ing] significant resources to developing" capabilities is misleading if the company has not yet developed those capabilities.  Opp. 9.  While one of the alleged misstatements in that case referenced that Fitbit "dedicate[s] significant resources to developing" the company's technology, the full statement was about the *accuracy* of the company's products:  "We dedicate significant

---

[7] Plaintiffs challenge Donahoe's statement on *Adobe's* Facebook page.  ¶ 504.  It defies common sense that NIKE's CEO would mislead the Company's investors about its technology capabilities through another company's Facebook page.

resources to developing proprietary sensors, algorithms, and software *to ensure that our products have highly accurate* measurements, insightful analytics, compact sizes, durability, and long battery lives." *Robb*, 216 F. Supp. 3d at 1027. The court found that plaintiffs had adequately pled this statement was materially misleading because the complaint pled with particularity that the device's ability to track heartrate was frequently inaccurate during exercise. *Id.* at 1028–29. Unlike *Robb*, Plaintiffs fail to allege any conflict between the challenged statement (that NIKE will build out its DTC technology capabilities) and the omitted facts (that the build out is moving slow).

Plaintiffs also argue that NIKE misled investors through risk factors that warned the Company "*may* not be successful in developing platforms that operate effectively with [digital] technologies, systems, networks or standards[,]" because these statements spoke of "as yet unrealized risks" when NIKE purportedly had "severe" technology problems. Opp. 12. Plaintiffs do not identify the purported "severe" problems but argue that NIKE's technology investments were not "delivering meaningful results" and that "Defendants were meeting regularly to discuss these struggles." Opp. 12. NIKE was transparent that it was *still in the process of developing* its technology platform. *See, e.g.*, ¶¶ 476, 518, 579; *Shuster v. Symmetricon, Inc.*, 1997 WL 269490, at *6 (N.D. Cal. Feb. 25, 1997) (failure to disclose alleged "fundamental flaws" was not misleading where defendants disclosed that "the [product] was still being developed and that research was still being done to enhance the product"). Accordingly, the risk of NIKE's failure to develop its technology platform was an ongoing one, and a "problem that can still be remedied by the time a defendant discloses the risk to investors." *HRSA-ILA Funds v. Adidas AG*, 745 F. Supp. 3d 1127,

1143 (D. Or. 2024) (cleaned up).[8]   Plaintiffs fail to identify any technology failure that rendered any statement false or misleading at the time it was made.

### D. Plaintiffs point to no facts showing that NIKE's product innovation statements were untrue.

Plaintiffs challenge NIKE's statements that it was investing in product innovation, ¶¶ 443, 446, 448, 571, that the "pace of innovation has not slowed down at all," ¶ 478, and that it had a "pipeline of innovative product," ¶¶ 512, 514, 540, 544, 550, 564, 566, 592, 594, based on CW allegations thrown together in an undifferentiated clump.  Opp. 14–16.  This, again, is improper puzzle pleading.  *Petersen*, 2024 WL 4602710, at \*4–5.  In any event, none of the allegations contradict any challenged statement about innovation.

*First*, Plaintiffs concede, as they must, that NIKE *did* invest in innovation and brought new products to market during the Class Period.  Opp. 15 n.9.  Plaintiffs seem to argue that NIKE's statements about its investments in product innovation nonetheless were misleading because, according to CW-16, NIKE was not "*focused* on innovation."  *Id*.  One unnamed witness's opinion about a subjective topic like "innovation" is insufficient to plead falsity under the PSLRA.  *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 944 (N.D. Cal. 2010) ("Hindsight and the former opinions of former employees do not generally rise to the level of falsity.").

---

[8] Neither *In re Facebook, Inc. Securities Litigation*, 87 F.4th 934 (9th Cir. 2023), nor *In re Alphabet, Inc. Securities Litigation*, 1 F.4th 687 (9th Cir. 2021), help Plaintiffs because, unlike here, the courts determined that plaintiffs in those cases had pled specific warned-of risks that had already happened.  *Facebook*, 87 F.4th at 948–50 (crediting allegation at pleadings stage that statement "our data or our users' data may be improperly accessed, used, or disclosed" was misleading when third party had improperly accessed user data); *Alphabet*, 1 F.4th at 694, 704 (company's warning that "concerns about our practices with regard to the collection, use, disclosure, or security of personal information or other privacy related matters, even if unfounded, could damage our reputation" was adequately pled to be misleading without disclosing "software glitch" exposing private data of users).

*Second*, Plaintiffs argue that NIKE's statement in October 2021 that its "pace of innovation has not slowed down at all" was false because "NIKE's innovation stalled after CDA launched" due to NIKE's overemphasis on classic franchises. *See* Opp. 15 n.9. Plaintiffs do not explain how an alleged "overemphasis" on classic franchises, *see id.* at 16, means that NIKE was not *also* developing new products.[9] *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1196 (9th Cir. 2021). Plaintiffs cite *In re Splunk Inc. Securities Litigation*, 592 F. Supp. 3d 919, 929 (N.D. Cal 2022) for the proposition that statements about "build[ing] [an] adequate pipeline can be misleading." Opp. 15. But *Splunk* is inapposite because, unlike here, the plaintiffs plausibly alleged that the company had *completely* "suspended marketing investments and instituted a hiring freeze of sales personnel" rendering misleading the company's statement that it would grow its sales pipeline through "significant investments in marketing." 592 F. Supp. 3d at 927–28, 939. Nothing of the sort is alleged here. Moreover, even if NIKE had "a gap in innovation" *as of summer 2022*, as Plaintiffs contend, Opp. 14, that would not render misleading NIKE's statement made *in October 2021*. *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 2021 WL 3748325, at *21 (N.D. Cal. Aug. 24, 2021) ("A temporal mismatch between a CW's statement and a Defendant's statement results in a failure to plead with particularity the reason or reasons why the statement is misleading.") (cleaned up).

*Third*, Plaintiffs argue that NIKE's general positive statements that the innovation pipeline was "unmatched," ¶¶ 443, 566, "relentless," ¶¶ 450, 514, 544, and "strong," ¶¶ 550, 594, are actionable because they supposedly were "inconsistent with internal information"—information

---

[9] In fact, NIKE's purported later "admission" makes clear that NIKE—using Plaintiffs' word—"flood[ed]" the market with classic franchisees, not because NIKE's product pipeline was deficient in any away, but "based on consumer demand." *See* Ex. 20 at 24.

that Plaintiffs do not identify.  Opp. 15.  Regardless, these statements are not actionable because they are generic statements not "capable of objective verification."  *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017). This Court should follow the many cases finding that similar statements were inactionable puffery. Mot. 20; *see also, e.g.*, *Lilien v. Olaplex Holdings, Inc.*, 765 F. Supp. 3d 993, 1016 (C.D. Cal. 2025) ("statements regarding [the company's] strong reputation and competitive position" were inactionable puffery).

Plaintiffs rely on *In re Quality Systems, Inc. Securities Litigation*, 865 F.3d 1130 (9th Cir. 2017), to argue that statements about NIKE's product pipeline being "strong" and "deep" were not puffery.  Opp. 15–16.  But the defendants in *Quality Systems*—unlike here—made detailed representations about the "past and present state" of their sales pipeline.  *Quality Sys.*, 865 F.3d at 1138, 1144.  Specifically, the company represented that "the number and type of prospective sales in the pipeline was unchanged, or even growing, compared to previous quarters," when internal documents showed precisely the opposite—"that the market had become saturated after a bubble." *Id.* at 1144.  Nothing close to these damning facts is alleged in the SAC.  Opp. 14–16.

Plaintiffs also argue that NIKE's warnings about its "potential inability to 'adjust[] . . . product offerings' and 'develop[] new products'" was misleading because the risk had already "materialized" with the alleged "innovation pipeline gap" in 2022.  Opp. 16.  But Plaintiffs badly misstate the actual language of the risk factor statement, which was focused on risks associated with the fickle nature of trends and consumer preferences.  *See, e.g.*, Ex. 8 at 14.[10]  Plaintiffs

---

[10] "*If we fail to anticipate accurately and respond to trends and shifts in consumer preferences* by adjusting the mix of existing product offerings, developing new products, designs, styles and categories, and influencing sports and fitness preferences through extensive marketing, we could

cherry-pick words like "develop[]" and "new products," to recast the risk factor into a statement about the Company's product pipeline, when the plain language says no such thing. *See Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148, at *15 (D. Ariz. Feb. 16, 2017) (rejecting effort to plead falsity by taking "statements out of context").

### E.    Plaintiffs point to no facts showing that NIKE's product category statements were untrue.

Plaintiffs claim that NIKE's statement that it had "successfully realigned" the organization into Men's, Women's, and Kids' categories was false because the reorganization was "a failure." Opp. 12–13. Yet again, Plaintiffs do not point to any particularized facts supporting their claim and rely instead on opinions of CWs who were unhappy with the reorganization. Opp. 13. Disagreement over a business decision, however, is a far cry from pleading a materially false statement under the PSLRA. *In re Swift Transp. Co., Inc.*, 2006 WL 1805578, at *8 (D. Ariz. Mar. 29, 2006) ("That a defendant's business strategy may be open to criticism does not show that the defendant made a misrepresentation."). Nor does the fact that NIKE later pivoted away from the reorganized consumer categories mean that its statements made years earlier were false when made. ¶ 475; *see Cloudera*, 121 F.4th at 1189 (a company's later launch of a new cloud product did not establish that "its previous product was weak or inadequate"). None of the challenged statements about NIKE's reorganization are actionable.

### F.    Plaintiffs point to no facts showing that NIKE's competition statements were untrue.

Plaintiffs do not respond in any way to Defendants' argument that NIKE's statements about competition and brand strength were inactionable puffery. Mot. 23; *see also In re Wet Seal, Inc.*

---

experience lower sales, excess inventories or lower profit margins, any of which could have an adverse effect on our results of operations and financial condition." Ex. 8 at 14.

*Sec. Litig.*, 518 F. Supp. 2d 1148, 1168–69 (C.D. Cal. 2007) (collecting cases dismissing statements regarding competitive advantage that cannot be objectively verified).   Instead, they argue that these statements were false based on the conclusory assertion that "NIKE's brand equity and competitive standing deteriorated under CDA."  Opp. 17.

Plaintiffs' reliance on *In re Allaire Corp. Securities Litigation*, 224 F. Supp. 2d 319 (D. Mass. 2002), is misplaced.  Opp. 17–18.  There, the court held that a company's statement that it had "competitive advantage over rivals" to introduce a product called Spectra was misleading because its "existing customer base clearly indicated that it would not be a lucrative source of Spectra sales."  *Allaire*, 224 F. Supp. 2d at 337.  The court found this statement of opinion actionable because defendants "lacked any rational basis upon which to base such a belief."  *Id.*  Unlike *Allaire*, Plaintiffs point to no facts undercutting NIKE's opinion that it had a competitive advantage in the market.

Plaintiffs attempt to clear this hurdle with CW accounts alleging NIKE's loss of market share.  But these CW accounts, even if credited, only allege that NIKE lost market share in two specific categories—"women's sportswear" and "the running specialty channel"—but say nothing about NIKE's *overall* competitive standing or the Company's strong financial results during much of the Class Period.  Opp. 17–18; *see, e.g.*, *Dolly v. GitLab Inc.*, 2025 WL 2372965, at *13 (N.D. Cal. Aug. 14, 2025) ("[T]he alleged decline in [one product category] does not contradict Defendants' statements that reflect an overall positive financial outlook for the company.").

Plaintiffs also challenge two specific statements in September 2022 describing NIKE as the "number one cool and number one favorite brand."  ¶¶ 542, 546.  Even if these generic positive statements were actionable—and they are not—Plaintiffs cannot square their assertion that NIKE lost its "cool" status with their admission that competitors remained *behind* NIKE.  ¶ 321 (CW-2

alleging that "NIKE was losing ground to its competitors, specifically Adidas and Lululemon, both who [*sic*] were gaining points and *catching up* in 'cool' metrics") (emphasis added); *see* Mot. 24. Plaintiffs try to avoid this inconsistency by arguing that "at this stage (pre-discovery), the PSLRA does not require such granularity."  Opp. 18 n.12.  But granularity is precisely what the PSLRA requires:  Plaintiffs must "stat[e] with particularity the facts supporting each of their beliefs as to why the challenged statements were false or misleading."  *See Forescout*, 63 F.4th at 769 (9th Cir. 2023).

Plaintiffs claim NIKE's warnings about competitive risks were misleading because "those harms had 'already materialized.'"  Opp. 18–19.  But Plaintiffs do not say what those harms were and how they rendered NIKE's disclosures about competition false or misleading.  *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1256–57 (10th Cir. 2022) (disclosures about hypothetical risks are not misleading unless the risk "had materialized" or was "virtually certain" to); *see, e.g.*, *Lilien*, 765 F. Supp. 3d at 1013–15 (rejecting challenge to statements "warn[ing] of the risk of reputational and financial harm writ large").  This is in marked contrast to cases relied on by Plaintiffs where the disclosed "risk" clearly had occurred.  *Cf. In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *2, *6 (C.D. Cal. Jun. 7, 2018) (company misleadingly stated that "Instagram's Stories feature *may* be directly competitive" when Instagram was already taking market share); *In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 769–70 (N.D. Cal. 2020) (a company's risk factor statements regarding reputational risk were misleading because they failed to warn of reputation risk due to sexual assault allegations and litigation which had already materialized when such statements were made).

* * * * *

For all these reasons, Plaintiffs fail to plead particularized facts demonstrating that any of

the challenged statements were false or misleading at the time they were made.

## II.    Plaintiffs Fail to Plead a Strong Inference of Scienter

Under the PSLRA, Plaintiffs must plead with particularity facts that give rise to a strong inference of scienter—an inference that is not only reasonable, but "cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 314.  Plaintiffs' opposition offers no coherent—let alone compelling—theory as to *why* NIKE's executives would perpetrate a three-and-a-half-year fraud during the time NIKE was (i) undeniably experiencing strong results for several years, (ii) investing billions of dollars to support CDA and DTC initiatives, and (iii) buying back over $16 billion of the Company's stock.  The far more cogent and compelling inference drawn from the allegations is that NIKE executives believed CDA was succeeding and would continue to drive growth, and they adjusted course when they concluded the strategy was no longer effective.  Plaintiffs' allegations, considered individually or together, fail to raise a strong inference of scienter.

### A.    Plaintiffs allege no facts to show Defendants' knowledge of falsity.

Plaintiffs effectively concede that none of their allegations demonstrate Defendants' *actual knowledge* of the "widespread CDA problems."  Opp. 26–32.  Rather, they ask the Court to infer Defendants' knowledge by arguing they had "actual access" to purported information about the alleged CDA problems.  *Id.*  Plaintiffs fail to plead facts that support any reasonable inference that Defendants had access to information contradicting their statements.

*First*, Plaintiffs claim that "the CW accounts show that Defendants had actual access to or knew of" the problems related to the CDA components through purported meetings and reports—such as quarterly audit meetings and reports discussing "DTC supply chain problems," or one-on-one meetings with Donahoe about "DTC technology problems."  Opp. 28–29.  But pleading

scienter based on a defendant's "actual access" to information requires specific facts about "the who, what, where, when, and how regarding each Defendant's access to the relevant information that belies fraudulent intent." *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 932 (N.D. Cal. 2017). This is no small feat. Plaintiffs do not even try in their opposition to identify *what* specific contrary information each Defendant purportedly knew, or how he or she obtained access to it. For that reason alone, Plaintiffs' claim must fail. *See Petersen*, 2024 WL 4602710, at *11–12.

Plaintiffs' key authority, *Quality Systems*, only highlights the absence of the required "who, what, when, where, and how" facts. There, plaintiffs pled particularized facts showing that the defendants had "actual access" to internal data that contradicted public statements. *Quality Sys.*, 865 F.3d at 1145. For example, one defendant in that case admitted to analysts that he *reviewed* internal data, *when* he reviewed internal data, and *identified the specific type* of data he reviewed. *See id*. In stark contrast, Plaintiffs plead no facts concerning what internal data supposedly was provided to any defendant, when it was provided, what it said, or how it contradicted any challenged statement. Vague allegations that executives received some allegedly adverse information at some unspecified time during a three-and-a-half-year period are far short of the specificity required under the PSLRA. *See In re Silicon Graphics Inc. Sec. Litig.*, 970 F. Supp. 746, 767 (N.D. Cal. 1997) (details about the alleged negative internal reports required to establish a strong inference of fraud).[11] Any adverse information allegedly known to defendants at most reflects ordinary operational challenges—in other words, "the daily work of business people"—

---

[11] Plaintiffs cite *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918 (9th Cir. 2023), for the proposition that Defendants' demand for exact dates and content of the reports sent to O'Neill is inappropriate. Opp. 31 n.30. But *NVIDIA* never held that generalized references to meetings or unspecified problems in reports plead scienter. *See* 81 F.4th at 939–39, 947.

PAGE 20 – DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT

not evidence of scienter.  *Ronconi*, 253 F.3d at 434.[12]  Indeed, there is no allegation that any Defendant believed any specific operational problem meant that NIKE could not execute its overall CDA strategy successfully.  *See In re NVIDIA Corp. Sec. Litig.*, 2011 WL 4831192, at *11 (N.D. Cal. Oct. 12, 2011), *aff'd*, 768 F.3d 1046 (9th Cir. 2014) ("Knowledge of the problem, however, is insufficient to infer that [defendant] acted with the intent to defraud or with deliberate recklessness in not reporting the issue publicly.").

Plaintiffs ask the Court *to assume* each Defendant's knowledge of adverse facts based on CW opinions that CDA issues were "widespread."  Opp. 28, 31.  Plaintiffs' reliance on *Sylebra Cap. Partners Master Fund Ltd. v. Everbridge, Inc.*, 2025 WL 1938359 (9th Cir. July 15, 2025), is misplaced.  Opp. 28, 31.  There, the court held that the plaintiff had adequately pled scienter because CW allegations showed specific contemporaneous data contradicting public statements had been *provided directly to executives*.  *See Everbridge*, 2025 WL 1938359, at * 1.  The plaintiffs alleged that the defendants "told investors that integration of its acquisitions was going well or that integration was completed when, in fact, the company was facing large hurdles that stood in the way of integrating its acquisitions," and that the defendants "understated revenue contribution from an acquisition to hide slowing growth."  *Id.*  The Ninth Circuit held that the plaintiffs adequately alleged scienter concerning those statements based on "weekly or bi-weekly emails to [the defendants] with the modeling in the lead-up to the acquisition" that showed discrepancies in the company's internal and external reporting.  *See id.*  Nothing close to that is alleged here.  Instead, Plaintiffs rely on a smattering of vague assertions and unsubstantiated opinions about the

---

[12] Plaintiffs contend *Ronconi* is distinguishable because the plaintiffs there "alleged merely unspecified 'problems.'"  Opp. 30 n.29.  But Plaintiffs' allegations are no different here—they allege generalized issues related to the six "components" of CDA, without explaining why these problems show Defendants' knowledge that CDA, as a whole, was unsuccessful.

PAGE 21 – DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT

general state of NIKE.[13]  Such CW accounts reflecting disagreement with the company's strategy were rejected as inadequate in *Everbridge*.  2025 WL 1938359 at *2; *see, e.g.*, ¶¶ 371–73, 688–91.

Plaintiffs also ask the Court to infer *all* Defendants' knowledge under the core operations doctrine based on the same deficient allegations of "actual access to the disputed information." Opp. 26–33.  Plaintiffs' core operations theory fails for at least two reasons.

*First*, the CDA strategy is not the type of product or business operation that courts have found to be "core," as reflected in Plaintiffs' own authority.   In *Hayden v. Portola Pharmaceuticals, Inc.*, the company sold a single drug that accounted for 99% of its revenues. 2021 WL 3506614, at *5 (N.D. Cal. Aug. 10, 2021), *abrogated on other grounds by Hayden v. Portola Pharms., Inc.*, 2022 WL 4374962, at *1 (N.D. Cal. Jan. 20, 2022).  *Stitch Fix* involved a new product rollout that hurt the company's flagship product.  2025 WL 1900722, at *9.  In those contexts, courts found that it would be "absurd" to suggest that executives were unaware of problems.  NIKE sells athletic apparel and shoes—not business strategies.  A corporate growth initiative is not a "core operation."  *See KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 612 (4th Cir. 2021) (cautioning against labeling "broad corporate strategies," such as company's "move into the digital space and investments in its human capital," as core operations).  Extending the core operations doctrine to apply to a corporate strategy would stretch the rarely used doctrine beyond its breaking point.

---

[13] Plaintiffs, through CW accounts, offer at least four different theories as to why NIKE decided to lower its internal targets for opening NIKE Live stores in North America: (1) the stores were not performing well (*i.e.*, not generating revenue); (2) the Company had trouble finding real estate for its stores; (3) these stores experienced supply chain issues; and (4) the stores experienced product-pipeline problems.  ¶¶ 160–63, 288, 342–43.

*Second*, even if CDA could be deemed a "core operation" of NIKE during the Class Period, Plaintiffs never identify what specific, adverse facts should be imputed to Defendants. Plaintiffs do not explain how NIKE internally measured CDA's "success," nor do they identify any metric or report suggesting that CDA was failing. And throughout most of the Class Period, NIKE consistently reported strong financial results, including significant growth in digital and DTC revenues. At bottom, Plaintiffs' "core operations" theory amounts to a claim that because Defendants occasionally attended meetings or received reports about everyday operational issues regarding the Company's strategy, that is enough to plead scienter. Opp. 32–33. Plaintiffs are wrong as a matter of law. *Shnayder v. Allbirds, Inc.*, 2025 WL 1745596, at *21–22 (N.D. Cal. June 23, 2025) (defendants' attendance in countless meetings where various operational issues were discussed and their alleged "very hands on and controlling" management style insufficient to invoke the core operations doctrine).

### B.     Plaintiffs fail to allege scienter through executive departures and stock sales.

Plaintiffs also fail to plead scienter based on some executives departing their positions or selling NIKE stock. These allegations fail to plead scienter as to any Defendant, let alone all of them.

***Executive Departures***. Plaintiffs' opposition merely repeats the conclusory assertion that Donahoe's and Campion's departures support scienter, without explaining how those departures were supposedly "suspicious." Opp. 33–34. Plaintiffs point to the *timing* of their departures as supposedly supporting an inference of scienter, but that makes little sense. *See* Mot. 30–31. It is not surprising that Donahoe retired after CDA allegedly did not succeed and his successor opted to "reverse course." Opp. 34. "Indeed, it is hardly suspicious in isolation for a company's CEO to depart upon the company's announcement of disappointing financial results." *In re UiPath,*

*Inc. Sec. Litig.*, 2025 WL 2065093, at *16 (S.D.N.Y. July 23, 2025). Plaintiffs also make no effort to explain how Campion's departure was "suspicious"; to the contrary, they fail to even address (let alone dispute) public reports that he left NIKE to direct an academic program at UCLA and to serve as CEO of a youth sports business—innocuous reasons having nothing to do with Plaintiffs' untenable theory of fraud.[14] Mot. 31 n.11. Plaintiffs' allegations amount to nothing more than routine executive turnover, which is commonplace and does not support an inference of fraudulent intent. *See Zucco*, 552 F.3d at 1002; *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1138–39 (S.D. Cal. 2012).

**Stock Sales.** The opposition points only to rote stock sales by three of the five defendants without addressing authority establishing that those stock sales are insufficient to support scienter.[15] Plaintiffs ignore the lack of any stock sales by Campion, which destroys any possible inference of scienter on his part. Opp. 34–35; Mot. 34. The same is true of O'Neill. Opp. 34–35; Mot. 34.; *Metzler Inv. GMBH v. Corinthian Coll., Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) ("[One individual defendant] meanwhile sold nothing at all, suggesting that there was no insider information from which to benefit."). For the remaining Defendants, none of the alleged stock sales were suspicious.

*First*, Parker's sales were consistent with his prior trading history. In fact, he sold more

---

[14] Plaintiffs also fail to explain how Lavu's resignation supports any *Defendant's* intent. Opp. 33–34. Indeed, Plaintiffs' allegation that "Lavu lied to management" and "blocked communication" undermines scienter (*see* Opp. 11)—as it suggests NIKE's senior executives were themselves misled about alleged technology problems.

[15] Plaintiffs also argue that Defendants were motivated to commit fraud to increase their compensation, Opp. 34–35, but they ignore the common sense point that it is "hardly unusual for an officer of a publicly traded company to hope to maintain—or increase—the company's stock price" and that executive compensation often is based on the achievement of corporate goals. *Joyce v. Amazon.com Inc.*, 2025 WL 835054, at *4–5 (W.D. Wash. Mar. 17, 2025); Mot. 33–34.

shares during the Control Period than during the Class Period, which negates any inference that he suspiciously timed sales because he supposedly was engaged in securities fraud. Mot. 34; *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999) (stock sales suspicious only where they are "dramatically out of line with prior trading practices"), *superseded by statute on other grounds*.

*Second*, Friend's sales were nondiscretionary, pursuant to a Rule 10b5-1 trading plan and for tax withholdings. *See* Ex. 24. Courts consistently hold such sales do not support an inference of scienter. *See In re Eargo, Inc. Sec. Litig.*, 2023 WL 5663154, at *1 (N.D. Cal. Aug. 31, 2023) ("Non-discretionary trades generally do[ ] not support an inference of scienter.").

*Third*, judicially noticeable SEC filings show that all of Donahoe's sales were for tax withholdings, as Plaintiffs tacitly concede. Opp. 35 n.31. Plaintiffs rely on *Freudenberg v. E*Trade Financial Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010), to argue that such fact does not preclude scienter. *Id*. But in *Freudenberg*, the court found that plaintiff adequately pled scienter where specific facts showed the defendant had direct knowledge of information contradicting his public statements—*not* based on his sale of stock for tax withholdings. 712 F. Supp. 2d at 201. Plaintiffs plead no facts demonstrating Donahoe's knowledge of any contemporaneous contradictory information. His stock sales were not remotely suspicious.

### C. The competing non-fraudulent inference is far more compelling.

Plaintiffs claim that Defendants' competing inference—*i.e.*, that Defendants adjusted their strategy in good faith as market forces shifted—is "belied by the facts." Opp. 35. But Plaintiffs do not identify these mystery facts, and their own pleading strongly undercuts any inference of fraudulent intent. NIKE consistently reported strong results during the early years of CDA, and as performance later declined, the Company was transparent with investors about softening DTC

demand, the need to re-engage wholesale partners, and challenges in innovation and channel mix. ¶¶ 621–67. If Defendants were engaged in a fraudulent scheme, it makes no sense that they would voluntarily disclose the very information that supposedly revealed the fraud. It also defies logic that Defendants would direct NIKE to repurchase more than 150 million shares of artificially inflated stock. The most compelling and cogent inference drawn from the core allegations in the SAC is that Defendants believed in CDA, invested heavily in the strategy, and adjusted when the strategy did not yield desired results. That CDA ultimately did not work out as planned is unfortunate, not fraudulent.

## CONCLUSION

For the above reasons, Defendants' motion to dismiss should be granted with prejudice.

DATED: September 25, 2025

STOEL RIVES LLP

_s/ John Casey_
B. John Casey, OSB No. 120025
 john.casey@stoel.com
Alex Van Rysselberghe, OSB No. 174836
 alex.vanrysselberghe@stoel.com
Telephone: (503) 224-3380

GIBSON, DUNN & CRUTCHER LLP
Brian M. Lutz *(Pro Hac Vice)*
 blutz@gibsondunn.com
Jessica Valenzuela *(Pro Hac Vice)*
 jvalenzuela@gibsondunn.com
Jeff Lombard *(Pro Hac Vice)*
 JLombard@gibsondunn.com

*Attorneys for Defendants Nike, Inc., John J. Donahoe II, Matthew Friend, Mark G. Parker, Heidi L. O'Neill, and Andrew Campion*

PAGE 26 – DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT