**STOLL STOLL BERNE LOKTING & SHLACHTER P.C.**
Timothy S. DeJong, OSB No. 940662
tdejong@stollberne.com
Keith A. Ketterling, OSB No. 913368
kketterling@stollberne.com
Cody Berne, OSB No. 142797
cberne@stollberne.com
209 Southwest Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840

*Liaison Counsel for Lead Plaintiffs and the*
*Proposed Class*

*Additional Counsel on Signature Page*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

|  |  |
|---|---|
| | ) Case No. 3:24-cv-00974-AN |
| | ) |
| | ) Judge: Hon. Adrienne Nelson |
| | ) |
| | ) **PLAINTIFFS' OPPOSITION TO** |
| | ) **DEFENDANTS' MOTION TO** |
| IN RE NIKE, INC. SECURITIES LITIGATION | ) **DISMISS SECOND AMENDED** |
| | ) **CONSOLIDATED CLASS ACTION** |
| | ) **ALLEGATION COMPLAINT FOR** |
| | ) **VIOLATIONS OF THE FEDERAL** |
| | ) **SECURITIES LAWS** |
| | ) |
| | **ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

GLOSSARY OF DEFINED TERMS ......................................................................... vii

I.      INTRODUCTION AND STATEMENT OF FACTS ....................................... 1

     A.      Defendants Misrepresented the Success of CDA and Its Six Components ............ 1

     B.      The Truth Gradually Emerged, Causing Massive Investor Losses ........................ 3

     C.      Defendants' Attempt to Evade Liability Should Be Denied ................................. 3

II.      ARGUMENT ................................................................................................... 5

     A.      The SAC Adequately Alleges Falsity ................................................... 5

         1.      Statements About the CDA Strategy Components Were Misleading ........ 6

             a.      Supply Chain Misstatements ........................................................ 6

             b.      DTC Technology Misstatements ...................................... 9

             c.      Corporate Reorganization Misstatements ..................................... 12

             d.      Innovation and Pipeline Misstatements ....................................... 14

             e.      Competition and Brand Strength Misstatements .......................... 16

             f.      Channel Mix Strategy Misstatements ........................................... 19

         2.      Defendants' Statements Touting CDA's Success Were Misleading ........ 20

         3.      Defendants' Misstatements Are Not Inactionable Opinions ................... 24

         4.      Defendants' Misstatements Are Not Immaterial Puffery ........................ 24

     B.      The SAC Adequately Alleges Scienter ................................................ 26

         1.      The CW Allegations and Defendants' Admissions Support Scienter ...... 26

             a.      The CWs Have a Sufficient Basis of Knowledge ........................ 27

             b.      The CW Allegations Are Indicative of Scienter .......................... 28

         2.      Core Operations and Defendants' Close Monitoring Support Scienter .... 32

3.      Defendants' and Other Key Executives' Departures Bolster Scienter ..... 33

4.      The SAC's Motive Allegations Support Scienter ..................................... 34

5.      Defendants Have Not Proffered a More Compelling Inference ............... 35

III.    CONCLUSION ........................................................................................................ 35

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Acuity Brands, Inc. Sec. Litig.*,
    2019 WL 10246166 (N.D. Ga. Aug. 12, 2019) ........................................................19

*In re Allaire Corp. Sec. Litig.*,
    224 F. Supp. 2d 319 (D. Mass. 2002) .................................................17, 18, 25

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) .......................................................................12

*In re Apple Inc. Sec. Litig.*,
    2020 WL 2857397 (N.D. Cal. June 2, 2020) ...........................................................5

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ...............................................................6, 28

*Bielousov v. GoPro, Inc.*,
    2017 WL 3168522 (N.D. Cal. July 26, 2017) ...................................................... 33-34

*In re BioMarin Pharm. Sec. Litig.*,
    2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ............................................................35

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
    2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) .................................................. 12-13

*In re Cloudera, Inc.*,
    121 F.4th 1180 (9th Cir. 2024) .......................................................................21

*Cooper v. Pickett*,
    137 F.3d 616 (9th Cir. 1997) .......................................................................17

*Cutler v. Kirchner*,
    696 F. App'x 809 (9th Cir. 2017) .......................................................................24

*In re Dentsply Sirona, Inc. Sec. Litig.*,
    665 F. Supp. 3d 255 (E.D.N.Y. 2023) .............................................................15, 23

*In re Downey Sec. Litig.*,
    2009 WL 2767670 (C.D. Cal. Aug. 21, 2009).......................................................8

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
    81 F.4th 918 (9th Cir. 2023) ...............................................................5, 29, 31

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

*In re Extreme Networks, Inc. Sec. Litig.*,
   2018 WL 1411129 (N.D. Cal. Mar. 21, 2018).......................................................... 27, 29-30

*In re Facebook, Inc. Sec. Litig.*,
   87 F.4th 934 (9th Cir. 2023) ...................................................................................12, 16, 19

*Fecht v. Price Co.*,
   70 F.3d 1078 (9th Cir. 1995) ...................................................................................25

*Freudenberg v. E*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010).......................................................................35

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023) ................................................................................... *passim*

*Hatamian v. Advanced Micro Devices, Inc.*,
   87 F. Supp. 3d 1149 (N.D. Cal. 2015) .....................................................................7

*Hayden v. Portola Pharms., Inc.*,
   2021 WL 3506614 (N.D. Cal. Aug. 10, 2021) ........................................................33

*Homyk v. ChemoCentryx, Inc.*,
   2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) .........................................................5

*HRSA-ILA Funds v. Adidas AG*,
   745 F. Supp. 3d 1127 (D. Or. 2024) ........................................................................16

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ...................................................................................22, 25, 26

*Kyung Cho v. UCBH Holdings, Inc.*,
   890 F. Supp. 2d 1190 (N.D. Cal. 2012) ...................................................................35

*In re Lattice Semiconductor Corp. Sec. Litig.*,
   2006 WL 538756 (D. Or. Jan. 3, 2006) ...................................................................15, 29

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) .................................................................................28

*In re Lyft Inc. Sec. Litig.*,
   484 F. Supp. 3d 758 (N.D. Cal. 2020) .....................................................................19

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) ...................................................................................7, 14, 16

*Nguyen v. Radient Pharm. Corp.*,
   946 F. Supp. 2d 1025 (C.D. Cal. 2013) ...................................................................8

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ................................................................................35

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)....................................................................................4

*Nursing Home Pension Fund v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ...............................................................................33

*NVIDIA Corp. v. E. Ohman J*,
  604 U.S. 20 (2024).................................................................................................29

*NVIDIA Corp. v. E. Ohman J*,
  144 S. Ct. 2655 (2024)...........................................................................................29

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)...............................................................................................24

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) .................................................................................30

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) .....................................................................8, 12, 35

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ...................................................................... *passim*

*In re QuantumScape Sec. Class Action Litig.*,
  580 F. Supp. 3d 714 (N.D. Cal. 2022) ....................................................................5

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ...................................................................................4

*Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*,
  2025 WL 1900722 (N.D. Cal. July 9, 2025)........................................21, 24, 32, 33

*Robb v. Fitbit Inc.*,
  216 F. Supp. 3d 1017 (N.D. Cal. 2016) ...................................................................9

*Roberts v. Zucora, Inc.*,
  2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) .......................................................28

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) .................................................................................30

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) .................................................................................33

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016) ............................................................... 5, 7-8, 26, 30

*Sinnathurai v. Novavax, Inc.*,
645 F. Supp. 3d 495 (D. Md. 2022) ..................................................................6, 8

*In re Snap Inc. Sec. Litig.*,
2018 WL 2972528 (C.D. Cal. June 7, 2018) .........................................................19

*In re Splunk Inc. Sec. Litig.*,
592 F. Supp. 3d 919 (N.D. Cal. 2022) .................................................................15

*Sylebra Cap. Partners Master Fund Ltd. v. Everbridge, Inc.*,
2025 WL 1938359 (9th Cir. July 15, 2025)....................................................28, 31

*Tellabs, Inc. v. Makor Issuers & Rts., Ltd.*,
551 U.S. 308 (2007)........................................................................5, 26, 34, 35

*Warshaw v. Xoma Corp.*,
74 F.3d 955 (9th Cir. 1996) ............................................................................5

*Weston v. DocuSign, Inc.*,
669 F. Supp. 3d 849 (N.D. Cal. 2023) ....................................................20, 23, 35

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) .......................................................................22

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .....................................................................18, 28

**Statutes & Rules**

Private Securities Litiation Reform Act of 1995 ................................................. *passim*

Section 10(b) of the Securities Exchange Act of 1934 ....................................3, 4, 5, 35

Section 20(a) of the Securities Exchange Act of 1934 .................................................35

Fed. R. Civ. P. Rule 9(b)..................................................................................5

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

## GLOSSARY OF DEFINED TERMS

| | |
|---|---|
| A/B Testing | A/B Testing is a method of comparing two versions of a webpage or mobile app against each other to determine which one performs better. ¶224, n. 35. |
| Adobe | Adobe, Inc., provider of digital marketing software. ¶13. |
| Adobe Experience Platform | Described by Adobe as a platform that "enables organizations to centralize and standardize customer data and content from any system and apply data science and machine learning to dramatically improve the design and delivery of rich, personalized experiences." ¶234, n. 36. |
| Board | NIKE's Board of Directors. |
| Campion | Defendant Andrew Campion, NIKE's former COO from April 2020 until June 2023, and former Managing Director of Strategic Business Ventures from June 2023 until his departure. ¶51. Campion reported to Donahoe during the Class Period. ¶187. On January 5, 2024, NIKE announced Campion's departure from NIKE. ¶761. |
| CDA | Consumer Direct Acceleration, NIKE's business strategy emphasizing a digitally enabled direct-to-consumer business model. ¶1. |
| CDIO | Chief Digital Information Officer. |
| CEO | Chief Executive Officer. |
| CFO | Chief Financial Officer. |
| Class Period | March 19, 2021 through October 1, 2024, inclusive. ¶797. |
| COO | Chief Operating Officer. |
| CWs | NIKE's former employees serving as confidential witnesses in the SAC. |
| Defendants | Collectively, NIKE, Donahoe, Friend, O'Neill, Campion, and Parker. |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

| Donahoe | Defendant John J. Donahoe II, NIKE's CEO throughout the Class Period. Donahoe was also a member of the Board and the Board's Executive Committee throughout the Class Period. ¶47. NIKE's Board announced Donahoe's departure from the Company on September 19, 2024. ¶762. |
| --- | --- |
| DTC | Direct-to-consumer sales strategy with an emphasis on selling products directly to consumers without a middleman—*e.g.*, wholesale partners that act as multi-brand retailers. ¶1-2. |
| Franchises | NIKE frequently refers to its various products as "franchises." ¶132. |
| Friend | Defendant Matthew Friend, NIKE's Executive Vice President and CFO throughout the Class Period. ¶48. |
| Giunco | Massimo Giunco, former NIKE employee who served in a variety of roles from 1997 to June 2022, including as Senior Brand Director from September 2017 to June 2022. ¶261. |
| Hill | Elliot Hill, NIKE's newly appointed President and CEO as of October 13, 2024. Hill had previously worked at NIKE for over 30 years, and had retired in 2020 as President - Consumer and Marketplace. ¶423. |
| Individual Defendants | Collectively, Donahoe, Friend, O'Neill, Campion, and Parker. |
| KPI | Key Performance Indicator. ¶330. |
| Lavu | Ratnakar Lavu, NIKE's CDIO during the Class Period, who reported to Campion. ¶187. Lavu's departure from NIKE was reported on February 20, 2023. ¶758. |
| MTD or Motion | Defendants' Motion to Dismiss the SAC (ECF No. 66) filed on May 12, 2025. |
| NIKE or the Company | Defendant Nike, Inc. ¶46. |
| NIKE Brand Digital or Digital | A segment within NIKE consisting of sales through NIKE's digital platforms (*e.g.*, its website and mobile apps). ¶83. |
| NIKE Live Stores | NIKE-branded brick-and-mortar stores. ¶77. |
| NPD Group | Third-party company retained by NIKE to track certain Company metrics, including market share. ¶315. |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

| O'Neill | Defendant Heidi L. O'Neill, President of NIKE Consumer and Marketplace from April 2020 to May 2023, and President, Consumer, Product & Brand of NIKE from May 2023 through the Class Period. ¶50. O'Neill reported to Donahoe during the Class Period. ¶704. |
| --- | --- |
| OSHA | Occupational Safety and Health Administration |
| Parker | Defendant Mark G. Parker, Executive Chairman of the NIKE Board throughout the Class Period. ¶49. |
| PSLRA | Private Securities Litigation Reform Act of 1995. |
| Plaintiffs | Collectively, Lead Plaintiffs Caisse de dépôt et placement du Québec and DEKA Investment GmbH. |
| Rule | Federal Rule of Civil Procedure. |
| SAC | The Second Amended Consolidated Class Action Allegation Complaint for Violations of the Federal Securities Laws (ECF No. 65) filed on March 24, 2025. Citations to "¶__" refer to paragraphs in the SAC. |
| Section 10(b) or §10(b) | Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). |
| Section 20(a) or §20(a) | Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). |
| VP | Vice President. |
| Williams | Craig Williams, NIKE's President of Geographies and Marketplace. ¶175 n.32. Williams reported to Donahoe during the Class Period. ¶175. |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

## I.     INTRODUCTION AND STATEMENT OF FACTS

This action arises out of Defendants' repeated misrepresentations to investors regarding the success of a key business strategy that NIKE announced in June 2020, called Consumer Direct Acceleration or CDA. ¶¶1, 94. CDA was the "next phase" in NIKE's pivot to selling products through DTC channels—*i.e.*, its website, mobile apps, and "digitally enabled" stores—rather than through "multi-brand" wholesale partners that traditionally sold NIKE products. ¶¶94-99. The strategy, whose purpose was to propel "long-term growth," hinged on six key components. ¶¶99-142. Defendants repeatedly claimed that NIKE was successfully executing these components and CDA was "working" to fuel such growth. In reality, each component was plagued by severe problems, and CDA was a ticking timebomb. When the truth came to light, investors lost billions.

### A.     Defendants Misrepresented the Success of CDA and Its Six Components

**Channel Mix, Reorganization, and Technology.** When CDA was announced, Donahoe described it as consisting of "three areas of acceleration." ¶95. First, NIKE would accelerate its pivot from wholesale to DTC channels—a channel mix that would better reflect demand. ¶96. Second, NIKE would reorganize its business around gender- and age-based "consumer construct[s]" ("Men's," "Women's" and "Kid's") instead of sport-based categories. ¶97. Third, NIKE would build "digital [technology] capabilities" to support this DTC shift. ¶98; ¶¶106-25.

During the Class Period, Defendants assured investors that NIKE was successfully executing these three components, claiming, *e.g.*, that: (i) CDA yielded "no signs of any [demand] softness" (¶548), and that NIKE's channel mix "strategy remains the same" (¶590); (ii) NIKE had "successfully realigned our organization" around its new "consumer constructs" (¶¶475, 484); and (iii) it was successfully "building the [DTC digital] capabilities," *e.g.*, consumer "personalization" technology, "enabled" by a partnership with Adobe (¶¶446, 476, 504). In reality, NIKE's

1

reorganization and channel mix shift were disasters. Per CWs, by late 2021, NIKE was secretly returning to wholesale partners to drive sales and, by mid-2022, was aggressively cutting internal store opening goals and reverting to its pre-CDA sport categories. ¶¶264, 331-50. Similarly, the Adobe partnership was a failure, and NIKE did not have the necessary DTC technological capabilities, including personalization—problems compounded by NIKE's dysfunctional technology group, led by an executive who created a corrupt "shadow organization." ¶¶170-253. These problems were so severe that CW-3, hired to help build DTC capabilities, had many meetings with Donahoe and other Defendants to discuss them beginning in early 2022. ¶¶171-200.

**Supply Chain, Innovation/Pipeline, and Brand Equity/Competition.** Defendants also touted the importance of three other CDA components: (iv) building an effective "[DTC] supply chain" (¶¶106-14); (v) continuing to "accelerate" innovation and "supercharge" NIKE's product pipeline (¶¶126-33); and (vi) maintaining "the strength of [NIKE's] brand" and "competitive separation" (¶¶134-37). Defendants claimed NIKE was achieving these goals, touting, *e.g.*: NIKE's "pivot to a more [DTC] supply chain" and investments in a "digital-first supply chain" (¶113); NIKE's "accelerate[d] innovation" (¶439), and that its "pace of innovation has not slowed down at all" (¶478); and that "the strength of [its] brand" was a "competitive advantage[]"(¶540), as "NIKE continue[d] to lead as the number one cool . . . brand" (¶¶546, 542).

In reality, these three components also struggled at this time. NIKE faced severe supply chain problems, as it failed to create a separate DTC distribution system, and store managers could not control inventory. ¶¶145-67. These problems were discussed at quarterly audit meetings attended by CW-1, and in related reports sent to Defendants. ¶¶151-55. Under CDA, innovation stalled, as NIKE flooded the market with older classic products rather than innovate new ones and thus faced a pipeline "gap" by mid-2022. ¶¶270-308. NIKE was losing market share to competitors

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

by early 2021 and was no longer rated as the top "cool" brand by May 2022. ¶¶313-28.

**CDA Success.** Defendants also misrepresented the overall success of the CDA strategy, claiming, *e.g.*, that it was "definitely working" (¶480) and that NIKE's strong financial results were "proof" of CDA's success (¶489). These statements misrepresented the true state of CDA, given the severe problems in the six areas. They were also misleading because NIKE's initial growth was, in fact, driven by other temporary factors: the COVID-19 pandemic, products in NIKE's pipeline before CDA, and NIKE's flooding the market with its older products. ¶¶361-68. Defendants also knew of many other red flags, *e.g.*, failure to meet internal revenue targets as they discussed in sales meetings, showing that the CDA strategy was a ticking timebomb. ¶¶369-88.

## B.    The Truth Gradually Emerged, Causing Massive Investor Losses

The CDA strategy failures were slowly revealed over four disclosures that caused significant declines in NIKE's stock price. ¶¶621-67. On December 21, 2023, NIKE announced disappointing financial results due to lagging DTC demand. ¶¶621-31. On March 21, 2024, NIKE reported another disappointing quarter, admitting it needed to make "important adjustments" to reverse key aspects of CDA, *e.g.*, a need to "sharpen our focus on sport," "drive . . . new product innovation," and "lean in with our wholesale partners." ¶¶632-42. On June 27, 2024, NIKE disclosed a third quarter of poor results and lowered guidance, attributable to CDA failures. ¶¶643-57. NIKE's stock fell nearly 20%—the largest drop in its history. ¶652. On October 1, 2024, the fraud was fully revealed, as NIKE disclosed another quarter of underperformance and withdrawal of its "full year guidance," due to CDA failures—*e.g.*, "channel mix headwinds." ¶¶658-67.

## C.    Defendants' Attempt to Evade Liability Should Be Denied

Defendants dispute only the falsity and scienter elements of §10(b), making various arguments that all fail. First, the SAC adequately alleges falsity. The SAC's *19* CWs detail severe,

*contemporaneous* problems in all six CDA components—accounts that are *further* corroborated by Defendants' later admissions and news reports—undermining their positive public statements *when made*. Thus, Defendants' "fraud by hindsight" label does not fit. Likewise, Defendants try to portray this as a case of mere corporate optimism or mismanagement about a business strategy gone awry. But their "false reassurances" to investors that CDA was working—when it clearly was not—amounts to "conduct actionable under the securities laws," rather than mere "matters of business judgment." *Novak v. Kasaks*, 216 F.3d 300, 311-12 (2d Cir. 2000); *Reese v. Malone*, 747 F.3d 557, 581 (9th Cir. 2014) (though defendants' "actions exemplify corporate mismanagement," the complaint pled §10(b) claims where they were "at the very least, deliberately reckless as to the [falsity] . . . of their public statements"). Defendants' concrete assurances about CDA are not inactionable opinions or puffery. As to NIKE's Class Period growth, Defendants concealed that it was driven by transient factors unrelated to CDA, *e.g.*, COVID-19, which temporarily boosted online shopping. Nor is this a case of full disclosure. Recent Ninth Circuit cases reaffirm that disclosures of *hypothetical* risks, when those risks have *already* occurred, as here, are misleading.

Second, the SAC adequately alleges scienter. The CWs are described with sufficient particularity to establish their reliability, and their accounts indicate that Defendants knew or had access to information about the CDA strategy's problems belying their positive public claims. Notably, the SAC includes a high-level CW, who was recruited by O'Neill to help build NIKE's DTC operations and had many meetings with Donahoe (her "life mentor" (¶173)) and other Defendants, starting in early 2022 wherein she *directly informed* them of NIKE's DTC technology woes. Such CW accounts show that Defendants acted with scienter—especially when viewed with other allegations, including Defendants' suspicious departures, insider stock sales, close monitoring of CDA, which was core to NIKE's business, and later admissions of CDA failures.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

## II.    ARGUMENT

On a "motion to dismiss a §10(b) action, courts must . . . consider the complaint ***in its***

***entirety***."[1] *Tellabs, Inc. v. Makor Issuers & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Courts must

"accept[] the plaintiff's allegations as true and draw[] all reasonable inferences in favor of the

plaintiff." *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 729 (N.D. Cal. 2022).

While Rule 9(b) and the PSLRA require §10(b) claims to be pled with particularity, this does "not

impose an insurmountable standard." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918,

947 (9th Cir. 2023). Defendants challenge only the falsity and scienter elements of §10(b).

### A.    The SAC Adequately Alleges Falsity

"Falsity is subject to a particularity requirement and the *reasonable inference* standard of

plausibility," which is lower than "the strong inference standard" for scienter. *Glazer Cap. Mgmt.,*

*L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (emphasis in original). A statement

is "materially false or misleading" if it is "inconsistent with" internal information. *In re Quality*

*Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017). "[O]nce defendants choose to tout

positive information to the market, they are bound to do so in a manner that wouldn't mislead

investors, including disclosing adverse information that cuts against the positive information."

*Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). A court should dismiss a

complaint "***only if*** reasonable minds could not disagree that the challenged statements were not

misleading." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996).[2]

---

[1] Unless otherwise noted, all emphasis is added and internal citations are omitted.

[2] Defendants' "pleading maze" argument (MTD at 10 n.3) fails. Unlike the complaints in their cases, the SAC, "though lengthy, [] is well-structured, logical, and clearly lay[s] out the . . . misstatements and why . . . [they] were misleading," tying them to specific contrary facts (while using internal cross-references to avoid repetition). *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *8 n.4 (N.D. Cal. June 2, 2020); *see Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *7 (N.D. Cal. Feb. 23, 2023) (upholding complaint that "require[d] the reader to flip back and forth").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

1.    **Statements About the CDA Strategy Components Were Misleading**

a.    **Supply Chain Misstatements**

Defendants repeatedly touted NIKE's DTC supply chain, claiming, that it used "data and analytics capabilities in our supply chain" enabling NIKE to "know . . . where to put our product" (¶446), and that NIKE had "three to four times greater digital distribution capability than" before CDA (¶510). They also hailed NIKE's investment in "building" a "digital-first supply chain." ¶¶463, 482; *see also* ¶¶441, 469, 497, 506, 553, 560, 569 (touting "invest[ment]" in supply chain functions, *e.g.*, "inventory management"). Given NIKE's undisclosed DTC supply chain issues, these claims gave an "impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

Plaintiffs do not rely on the "opinion" of only CW-1 to allege the falsity of these statements. MTD at 14-15. Multiple corroborative CWs recounted how NIKE faced severe supply chain problems inhibiting DTC operations—facts, not opinions. ¶¶145-65; *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 520-21 (D. Md. 2022) (supply chain statement false based on CW accounts that "supply chain issues . . . were always a struggle"). Per CW-1—VP, Global Store Development from August 2022-May 2024—NIKE's DTC supply chain was deficient, which resulted in operational problems, *e.g.*, that store managers could not control inventory flow, causing frequent movement of product between warehouses, stores, and storage units, which led to product losses and "hazardous" storerooms that violated OSHA. ¶¶146-50, 157-58. CW-2—a director in North America Consumer Direct Marketing from fall 2020 to fall 2022—described how NIKE Live stores could not allocate and evenly distribute products due to supply chain issues, contributing to NIKE slashing its target for store openings (from 200 to 100, and then 75) beginning in summer 2022. ¶¶160-63; *see also* ¶165 (CW-5: NIKE had not developed supply chain capabilities to plan

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

for DTC demand). These problems led to decreased sales of **20-30%** (CW-1, ¶158) and lower foot traffic in NIKE stores (CW-2, ¶163). Per CW-1, the Head of Global DTC discussed DTC supply chain problems with management, who "stymied" her attempts to fix the problem as NIKE ***refused to invest in creating a separate DTC distribution system, as this was too expensive***—contrary to Defendants' statements touting NIKE's "investment" in "building" such DTC supply chain capabilities. ¶¶151-53. These problems were discussed in quarterly audit meetings attended by CW-1 and in related reports—as a "***huge issue that needs to be fixed***"—sent to the Board and Defendants. ¶¶154-55.

These CW allegations are corroborated by Defendants' "later admissions" and related remedial measures. *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1160 (N.D. Cal. 2015). Just weeks after the Class Period, NIKE announced its Chief Supply Chain Officer now would report directly to new CEO Hill (who replaced Donahoe in 2024)—a move that was necessary to make NIKE's "supply chain and distribution . . . more efficient." ¶¶166-67.

In response, Defendants make two primary arguments. First, Defendants argue that the statements were true, as the SAC fails to allege that NIKE was not building or investing in a DTC supply chain. MTD at 13-14. But this ignores that, per CW-1, NIKE refused to invest in a ***separate distribution system for its DTC stores*** and instead used its ***wholesale*** system. ¶¶147-48, 151, 159.[3] Even if NIKE were investing in building a DTC supply chain, falsity "is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Thus, "once [D]efendants chose to tout positive information" about that effort, they were bound to disclose the "adverse information" known

---

[3] Likewise, that NIKE had a supply chain "budget" (MTD at 14) does not negate NIKE's lack of investment in a ***DTC-specific*** supply chain or erase NIKE's severe DTC supply chain problems.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

internally about the deficiencies in their DTC supply chain "that cut[] against the positive" picture

they painted. *Arena*, 840 F.3d at 706; *Sinnathurai*, 645 F. Supp. 3d at 521 ("Even if this statement

could be deemed to be technically accurate . . . once [defendant] chose to discuss supply chain . . .

issues, the failure to discuss the problems in those areas . . . would be a material omission.").

For this reason, Campion's statement touting NIKE's increased "digital commerce

distribution capability" (¶510) is also misleading, given such material omissions—even if NIKE

had increased its capabilities, they were still deficient (MTD at 15-16). Defendants also claim that

Campion truthfully disclosed that the DTC supply chain was a "work-in-progress." MTD at 15.

But such an argument that the statement is "not misleading in light of other statements Defendants

made is an attempt to argue the affirmative defense of truth-on-the-market." *Nguyen v. Radient

Pharm. Corp.*, 946 F. Supp. 2d 1025, 1035 (C.D. Cal. 2013). Defendants have not met their "heavy

burden of proof," *id.* at 1039 n.18, that the truth was "transmitted to the public with a degree of

intensity and credibility sufficient to effectively counterbalance any misleading impression" left

by Campion's positive assurances. *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996).

Second, Plaintiffs, in fact, *do* identify many statements specifically touting "the sufficiency

of [NIKE's] investments in its supply chain or its supply chain capabilities" (MTD at 14), all of

which are rendered misleading by the omitted facts described above. Notably, Defendants ignore

Friend's assurance that "we're employing data and analytics capabilities in our supply chain, so

we know how to more smartly flow our product, where to put our product . . . and where the

product sits around the world" (¶446)—which is contradicted by the above allegations describing

NIKE's deficient supply chain, including how NIKE could not effectively distribute its products.[4]

---

[4] *See also* ¶¶441, 482, 510. *In re Downey Sec. Litig.*, 2009 WL 2767670, at *10 (C.D. Cal. Aug. 21, 2009) is inapt (MTD at 14-15), as it featured CW accounts that "contradict[ed] one another."

### b.     DTC Technology Misstatements

Defendants also misrepresented NIKE's DTC technological capabilities. For example, they claimed that NIKE was successfully "building the capabilities that are required for NIKE to operate a digitally led omni-channel, [DTC] business at scale." ¶476. Defendants also hailed NIKE's DTC "personalization" technology (¶446) and a "partnership with Adobe" meant to build those and other DTC capabilities (¶¶504, 518, 579). In truth, during the Class Period, NIKE failed to develop these DTC technological capabilities, and its technology organization was plagued by dysfunction that compounded such issues—key, undisclosed problems that were inconsistent with Defendants' public portrayal of such capabilities, rendering their statements misleading. ¶432; *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1027-29 (N.D. Cal. 2016) (statements touting technological capabilities, *e.g.*, "dedicat[ing] significant resources to developing" such capabilities, false).

Notably, CW-3, VP of Digital Product who was hired to help build NIKE's DTC digital capabilities, given its technology was "antiquated," detailed how there was "***little to no progress***" in this buildout during her tenure (February 2020-July 2024). ¶¶178-201. For example, NIKE did not have working technology to deliver personalized digital marketing to consumers, such as email or SMS blasts or push notifications on NIKE's App; these gaps led to declines in consumer engagement, *e.g.*, a ***38% drop year-over-year in consumer email responses***. ¶¶179, 193-94. Such facts directly contradict statements touting DTC "personalization" technology. ¶¶446, 504, 579.

Other CWs corroborated such failures. ¶¶211-12, 224-32, 244-53. CW-12, a technology leader, confirmed that a new "content management system" ("CMS") from Adobe to provide personalized marketing emails was only in a pilot phase when she left in 2022. ¶¶203, 211. CW-15, a Technology Operations director, described the DTC strategy as a "colossal failure," as NIKE had not updated critical technology infrastructure, *e.g.*, coding to support DTC functions, which

9

contributed to NIKE's website outages and hurt digital sales. ¶¶245-51. Per CW-11, who worked

on the NIKE App and website, backend systems needed to support DTC operations failed to deliver

core functionality. ¶¶213-18, 230; *see* ¶253 (CW-10: there were "always issues" with NIKE App).

The Adobe partnership failures—and thus the falsity of Adobe-specific statements (¶¶504,

518, 579)—were particularly stark. Per CW-3—who was tasked with implementing the $400

million Adobe contract, signed in 2021—Adobe's tools were ineffective, the project stagnated for

three years, and the promised personalization technology did not work; thus, the Adobe project

ultimately brought in "zero dollars" versus the projected $1.5 billion or more in revenue. ¶¶196-98.

CW-12 confirmed the delays in Adobe building the CMS system (¶¶211-12), and CW-11

described how Adobe Target—a program used for A/B testing and targeted consumer marketing—

was incapable of doing what NIKE needed it to do (¶¶224-27). CW-14 similarly recalled the

Adobe Experience Platform—including the segment called "Target" that she worked on, intended

to target consumers with specific marketing campaigns and products, and another segment meant

to enable personalized email blasts—was still a "mess," as the platform had issues with various

tracking capabilities and was not "fully implemented," when she left in June 2022. ¶¶235-37.

Defendants' argument that their statements were literally true because NIKE invested in

DTC technology (MTD at 16-17) again misses the point, as literal truth is not the legal standard.

*See supra* at 7-8. Plaintiffs allege that Defendants' statements omitted such technology problems

and created the impression that NIKE's DTC technology buildout was progressing successfully,

when, it was actually failing, despite such investments. *E.g.*, ¶178. Defendants also claim that they

never "stated or [] implied the technological gains from its partnership with Adobe." MTD at 18.

Not so. Defendants declared that Adobe "played such an important role of delivering a more

personalized experience for our consumers" (¶504), assured that Adobe-enabled "personalization"

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

was "driving gains in member retention, click-through rates and conversion, resulting in higher demand per member" (¶579),[5] and touted "new capabilities activated in partnership with Adobe" that "will unlock additional productivity and demand creation and member retention" (¶518).[6]

Further, many CWs described how these technological problems were compounded by dysfunction and corruption in NIKE's technology group under CDIO Lavu. ¶¶186-90, 192, 199 (CW-3); ¶¶207-09 (CW-12); ¶¶215-33 (CW-11): ¶¶238-43 (CW-1, CW-8, CW-14). Defendants try to brush off such accounts as "irrelevant." MTD at 19. But these issues further hampered the technology group's ability to deliver the DTC technological capabilities that Defendants touted. For example, per CW-3, Lavu lied to management, understated costs, and created an inefficient "shadow organization" that duplicated roles, led to attrition of key talent, and failed to develop DTC technology. ¶¶187-88. CW-12 and CW-11 also described how Lavu's shadow team duplicated CW-3's group, clashed with CW-3's and other teams, blocked communication, and impeded progress on DTC technology projects. ¶¶207-09, 215-21. CW-1, CW-8, CW-14 and other sources (including later public lawsuits) also corroborated such misconduct by Lavu, including potential SEC violations, leading to his abrupt termination in February 2023. ¶¶240-43, 255-58.

NIKE's DTC technology problems were so severe that they were repeatedly raised to Defendants, who brought in consultants, *e.g.*, Accenture, that confirmed such issues. ¶¶192, 209. Notably, CW-3 had many meetings with Donahoe and other top executives about the DTC

---

[5] Friend's vague qualifier that NIKE was "only beginning to operationalize" Adobe's tools (MTD at 18) does not negate his claims about the present success of such "new capabilities." ¶579.

[6] The portion of the statement touting present "capabilities" that had been "activated in partnership with Adobe" is not forward-looking (MTD at 19) as it describes "current and past facts." *Quality Sys.*, 865 F.3d at 1141. Even if forward-looking, it is not protected by the PSLRA safe harbor: (i) the cautionary language that "NIKE ***may*** not be successful in building out its digital platforms" misleadingly warned of "a mere ***possibility*** [of] a risk that has ***already*** materialized," *Forescout*, 63 F.4th at 781; and (ii) the statement was made with actual knowledge of its falsity (§II.B, *infra*).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

technology problems, *e.g.*, Lavu's shadow organization and the Adobe issues, ***beginning in February 2022***—including an April 2022 Paris meeting where CW-3 presented a "roadmap" on such problems, and then ***monthly*** meetings with Donahoe, Friend, O'Neil, and others by May-July 2022. ¶¶182-84, 188-91; *see also* ¶241 (CW-8 emailed Donahoe and O'Neill in December 2021).

Defendants' risk disclosures in NIKE's 10-Ks, filed in July 2021, 2022, 2023, and 2024, stated that NIKE has "made significant investments in [DTC] digital technologies" and that it "***may*** not be successful in developing platforms that operate effectively with these technologies." ¶¶459, 531, 588, 609. Such statements were materially misleading as they "speak[] entirely of as-yet-unrealized risks when the risks have already come to fruition." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948-50 (9th Cir. 2023); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) (same). By the time of these statements—no later than July 2022—NIKE's technology problems (including due to Adobe) were so severe that Defendants were meeting regularly to discuss these struggles. In response, Defendants argue that their statements "transparently" disclosed that, *e.g.*, NIKE's technology capabilities were a "work in progress." MTD at 16-18. But this is again the unavailing truth-on-the-market defense. *See supra* at 8. Defendants' vague disclosures did not "effectively counterbalance" the misleading impression, *Provenz*, 102 F.3d at 1492-93, left by their assurances that the DTC technology was delivering meaningful results. *E.g.,* ¶¶446, 476.

### c. Corporate Reorganization Misstatements

Another central component of CDA was NIKE's corporate reorganization wherein it changed the categorization of its products—from sport-based to gender- and age-based "consumer constructs"—*i.e.*, "Men's," "Women's," and "Kids'." ¶122. Defendants touted the success of this reorganization—*e.g.*, when Donahoe and O'Neill claimed NIKE had "***successfully realigned our organization***" to these consumer constructs. ¶¶475, 484; *see also* ¶¶553, 560, 569.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

In reality, the reorganization was a failure. ¶433. In a July 2024 LinkedIn post, former Senior Brand Director Giunco described CDA as an "An Epic Saga of Value Destruction": by 2021 "hundreds of colleagues were fired" and NIKE "lost a solid process and thousands of years of experience and expertise" in sports-based products. ¶261; *see also* ¶280 (CW-16: similar). This restructuring "originated" a "lack of innovation" (¶261), which negatively impacted NIKE by mid-2022 (*infra* at 14-16). Defendants admitted that this reorganization failed, disclosing in December 2023 that CDA had "added complexity and inefficiency," necessitating a ***$2 billion*** restructuring. ¶273. Notably, Defendants admitted that NIKE had reversed its pivot to gender and age constructs: in summer 2023, it began "important adjustments" to revert to a "focus on sport" and, in spring 2024, "***completed completely aligning our organization along the lines of sport***." ¶¶275-76.

CWs indicate that NIKE's covert reversion to pre-CDA sports categorization began even earlier—by ***summer 2022***. Per CW-18, in mid-2022, NIKE underwent an organizational shift, which created General Managers for sports categories within the gender constructs in an attempt to recreate the pre-CDA sports categories within the still-existing gender and age structure to address concerns about NIKE's performance. ¶264. But NIKE's 10-Qs in October 2022, January 2023, and April 2023 misleadingly represented that "we have aligned our product creation and category organization around a new consumer construct focused on Men's, Women's and Kids.'" (¶¶553, 560, 569), omitting that NIKE in fact already was reverting to sport categorization.[7] These ***contemporaneous*** CW allegations belie Defendants' "fraud by hindsight" argument (MTD at 22). *See Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *8 (N.D. Cal. Aug. 7, 2020) (not improper "hindsight pleading" where "the complaint relies on contemporaneous" events to show

---

[7] Donahoe also misleadingly told investors in December 2023 that NIKE had "realigned" itself again (¶598), concealing that NIKE was still restructuring to reverse CDA. ¶¶257, 277, 598, 433.

statements were "untrue at the time they were made"). Defendants' other arguments fare no better. That NIKE did initially reorganize around gender and age constructs, and revived the pre-CDA sport categories within those constructs, does not make their statements "indisputably true." MTD at 21-22. Again, falsity "is measured not by literal truth." *Miller*, 519 F.3d at 886.

### d.    Innovation and Pipeline Misstatements

During the Class Period, Defendants further repeatedly represented that, under CDA, NIKE maintained a robust pipeline of innovative products. For example, Donahoe assured that NIKE had "accelerate[d] innovation" (¶439), and its "pipeline of innovative product . . . prove[s] that our strategy is working" (¶¶512, 540). Parker also claimed that NIKE's "pace of innovation has not slowed down at all" (¶478), and O'Neill insisted that NIKE's "innovation pipeline continue[d] to keep us in the lead" (¶592). *See also* ¶¶446, 448, 571 (touting NIKE's "investment" in innovation); ¶¶443, 450, 514, 544, 550, 564, 566, 594 (touting, *e.g.*, "strong" innovation pipeline).

But, after CDA's launch, per many CWs, NIKE's innovation and product pipeline stagnated, and it instead relied on flooding the market with classic "franchises" (its more famous older products like NIKE Dunk, Air Jordan 1, and Air Force 1 sneakers). ¶¶280-95. Defendants later admitted as much. ¶¶296-308. Indeed, in an April 2024 *Wall Street Journal* article about how NIKE's "[i]nnovation [s]tall[ed]" during the Class Period and NIKE's plan to "[r]everse [c]ourse," Donahoe admitted that NIKE "ramped up production" of classic franchises by "***early 2021.***" ¶305. This caused supply to outpace demand, forcing NIKE to "aggressive[ly]" reduce supply of these products toward the end of the Class Period. ¶¶304-08. This strategy, as Defendants admitted in 2024, caused "***a gap in innovation in [NIKE's] pipeline" known internally "a couple years ago,***" ***i.e., by summer 2022*** (¶301), and required NIKE to begin "rebuilding" its innovation pipeline by early 2023 (¶298)—an effort that was unsuccessful, as NIKE still had ***not "reestablish[ed] our***

***innovation edge***" by June 2024 (¶301). Such "later statements" support falsity as they "directly

contradict[] or [are] inconsistent with" earlier statements touting NIKE's innovation. *In re Lattice*

*Semiconductor Corp. Sec. Litig.*, 2006 WL 538756, at *16 (D. Or. Jan. 3, 2006).[8]

     The SAC includes corroborative "contemporaneous" allegations from CWs (¶¶280-95).

*Lattice,* 2006 WL 538756, at *16; *see In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 939 (N.D.

Cal. 2022) (statements "misled investors into believing, incorrectly, that [d]efendants'

investments" were "sufficient" to "build [an] adequate pipeline"). Per CW-16, it was clear in 2020

that CDA-driven layoffs would hurt NIKE's pipeline, and after CDA's launch, NIKE was not

focused on innovation. ¶¶280-82; *see also* ¶284 (Giunco: same). CW-1 and CW-2 recounted how

NIKE inundated the market with classic franchises in lieu of new products. ¶¶285, 287, 291-94

(CW-1: the strategy was a "dirty secret"); ¶295 (CW-2: NIKE focused on "pre-existing footwear").

     Critically, CW-16 described that by mid-2022, NIKE saw negative effects on new products

in the pipeline (¶282), which is corroborated by CW-2, who noted that pipeline problems were a

"major contributor[]" to NIKE's decision to lower its store opening goals in summer 2022 (¶288),

and Defendants' admission of an innovation "gap" at that time (¶301). Yet, Defendants continued

to tout NIKE's pipeline at that time and afterwards. *E.g.*, ¶¶512, 540 (June and September 2022);

¶571 (June 2023); ¶592 (September 2023). Thus, such statements hailing the "strong" and "deep"

"state of [the] pipeline" were "inconsistent with" internal information and thus false. *Quality Sys.*,

865 F.3d at 1143-44; *see also In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 285

(E.D.N.Y. 2023) (statements touting "innovation and new products" as growth drivers false).[9]

---

[8] These admissions show that Defendants recognized the innovation failure; thus, the SAC does not allege mere "disagreement with NIKE's business decision" (MTD at 20). *See also* ¶¶309-12.
[9] Defendants again argue such statements were true, as NIKE was "investing in innovation" and launched some "new products." MTD at 19-20. But Plaintiffs do not allege that NIKE cut off ***all***

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

Further, NIKE's 10-Ks filed in July 2022, 2023, and 2024 represented that NIKE's potential inability to "adjust[] . . . product offerings" and "develop[] new products" to meet consumer demand were merely hypothetical risks that "*could* have a material adverse effect." ¶¶525, 582, 603. These were misleading because "those risks had materialized," *Facebook*, 87 F.4th at 948-49—*e.g.*, in the form of NIKE's innovation pipeline "gap" in 2022. Tellingly, Defendants do not contest that these risks had materialized by then. MTD at 20-21. Instead, they claim that these statements disclosed that "the risk of overemphasizing its classic franchises existed and was continuing" and thus was not "merely hypothetical." *Id.* But the cited language referred to the prior sentence, which stated that "[f]ailure to [adequately] respond" to the listed issues "*could* have a material adverse effect on our sales." *Id.* Such language "that risks '*could*' occur when, in fact, those risks had already materialized" misleadingly "represented the risk . . . as purely hypothetical," contrary to Defendants' attempt to recast it as a disclosure of materialized problems. *Facebook*, 87 F.4th at 948-49. Indeed, Defendants did not disclose that NIKE's innovation had *already* stalled—nor was this "a given" (MTD at 21) here.[10] *See* ¶¶445, 452, 524, 552, 559, 568.

### e. Competition and Brand Strength Misstatements

Defendants repeatedly assured that NIKE had maintained its leading competitive position and brand strength under CDA. For example, they touted NIKE's "competitive advantages," including "the strength of our brand," as "prov[ing] that our [CDA] strategy is working" and enabling it to "stay ahead of competition" (¶¶512, 540, 557) and its innovation pipeline as "continu[ing] to create separation between us and our competition" (¶¶450, 514, 544). Defendants

---

innovation investment—rather, that NIKE's innovation stalled after CDA launched, as Defendants later admitted. These omitted facts render their statements misleading. *Miller*, 519 F.3d at 886.

[10] For this reason, *HRSA-ILA Funds v. Adidas AG* is easily distinguishable. 745 F. Supp. 3d 1127, 1140 (D. Or. 2024) ("Given Ye's public notoriety, the reasonable investor would have had further reason to understand that [such] 'improper behavior' *was a given, not a hypothetical*.").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

also claimed that NIKE was "in a stronger position relative to our competition than" pre-pandemic (¶461) and "NIKE continues to lead as the number one cool . . . brand in North America" (¶546). *See also* ¶¶489, 533, 535, 542, 548, 566, 571, 573, 577. These statements were misleading because NIKE's brand equity and competitive standing deteriorated under CDA. ¶¶289-328, 435.

Indeed, many CWs recounted that increased competition was already adversely affecting NIKE's sales and market share by Class Period start. For example, per CW-5, who left NIKE in *early 2021*, NPD Group data tracked by NIKE showed it was losing market share to competitors due to CDA-driven withdrawal from specialty retailers by that time. ¶315; *see also* ¶317 (CW-7: similar). Per CW-10, NIKE began losing accounts and market share in the running shoe category, which NIKE had long dominated, to new competitors, On and Hoka, in *summer 2021*. ¶316. And, per CW-15, during her tenure (May 2021-May 2024), NIKE was losing customers to Hoka and On because they were more innovative, while NIKE relied on its legacy products. ¶289; *see also* ¶¶291-94 (CW-1: same). CW-2 also confirmed that NIKE was losing customers and market share in women's sportswear (a key revenue generator (¶288)). ¶318; *see also* ¶320 (CW-19: same). Per CW-1, at a September or October 2023 VP summit, Defendants strategized how to "regain market share," with O'Neil presenting a remediation plan as NIKE was "no longer number 1, number 2, or number 3 in running products," a category that was the "DNA of NIKE." ¶319. Such CW accounts thus contradict Defendants' claims of continued "competitive separation" and that NIKE was "stay[ing] ahead of competition" due to its "competitive advantages," *e.g.*, innovation.[11] *See In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 337 (D. Mass. 2002) (statements touting, *e.g.*,

---

[11] These allegations defeat Defendants' claim that the SAC lacks specificity about market share losses. MTD at 23. Plaintiffs need not plead specific numbers. *See Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) ("declin[ing] to require that a complaint must allege specific [transactions] to specific customers at specific times with a specific dollar amount" to satisfy particularity).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

"competitive advantage" false given competition issues). Indeed, in June 2024, Friend admitted that NIKE was "repositioning . . . to be more competitive" and was "focused on *taking back market share*." ¶324. In October 2024, he admitted that "*we've lost market share in the running specialty channel*," attributing this to decisions made "more than four years ago" when NIKE "pulled back" from that sport category under CDA. ¶¶326, 420, 664; *see also* ¶¶327-28, 666-67.

Defendants' statements touting NIKE's brand strength—particularly, their September 2022 assurances regarding NIKE's continued position as the "number one cool" brand in North America (¶¶542, 546)—were similarly false. CW-2 detailed that the "cool" metric was a key brand health metric, tracked internally by NIKE, based on third-party consumer survey data. ¶321. By May 2022, such data showed that NIKE was no longer the number one "cool" brand among North American consumers aged 18-24—a key demographic—and was losing ground to competitors. *Id.* *See also* ¶¶323, 327-28, 666-67. Defendants' attempt to discredit CW-2 based on the date of her departure (MTD at 24) fails, as she was at NIKE until "*fall 2022*" (¶55)—which includes September 29, 2022, the date of the statements, contrary to Defendants' speculation. MTD at 24. CW-2 was also "in a position to be personally knowledgeable of th[is] information," *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (MTD at 24), as she observed such "cool" brand metric discussions at quarterly Brand meetings she attended. ¶¶55, 321.[12]

Defendants' competition and brand-related risk disclosures were also materially misleading. NIKE's 10-Ks in July 2021, 2022, 2023, and 2024 stated, for example, that "*if* we do not adequately and timely anticipate and respond to our competitors . . . demand for our products *may* decline" and that a potential "failure to maintain our reputation [and] brand image . . . *could*

---

[12] Defendants' other nitpicking of CW-2 statements (MTD at 24) is also meritless, as at this stage (pre-discovery), the PSLRA does not require such granularity. *See Forescout*, 63 F.4th at 769.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

negatively impact our business." ¶¶455, 457, 527, 529, 584, 586, 605, 607. But those harms had "**already** materialized" by that time, rendering such "hypothetical" risk warnings misleading. *Facebook*, 87 F.4th at 948-50; *see also In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *6 (C.D. Cal. June 7, 2018) ("hypothetical risk disclosures—*e.g.*, Instagram Stories '**may** be directly competitive,'" were misleading as they failed to "disclose known material adverse trends currently affecting" company) (emphasis in original); *In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 767-70 (N.D. Cal. 2020) (same for "risk factor statements" regarding "strong reputation and brand").[13]

### f.    Channel Mix Strategy Misstatements

For the CDA strategy to succeed, NIKE's "channel mix" between multi-brand and mono-brand channels needed to match consumer preferences. ¶¶138-41. Defendants assured investors that the CDA strategy achieved this balance. In September 2022, Donohoe claimed that NIKE was seeing "strong consumer demand in North America" with "**no signs of any softness**." ¶548. In September 2023, in response to an investor question if NIKE had "changed" its strategy vis-à-vis "re-entering various wholesalers," Donahoe assured that "[o]ur marketplace strategy **remains the same**." ¶590. These statements conveyed that NIKE had effectively driven business to its DTC channels without relying on its wholesale partners, and demand had not suffered. ¶¶549, 591, 436.

In reality, NIKE had turned back to multi-brand partners to drive demand as NIKE's DTC mono-brand stores underperformed. *Id.* By **early 2021**, sell-through rates showed that consumers were not buying new DTC products to the level NIKE expected, a key red flag. ¶330 (CW-5). By early 2022, NIKE Live stores were failing to hit sales, foot traffic, or conversion KPI goals. ¶¶338-

---

[13] Defendants' truth-on-the-market argument that they disclosed that "NIKE faced 'intense competition'" (MTD at 24) fails. "The crux of Plaintiffs' allegations is that Defendants failed to disclose, or deliberately understated, **the impact** increased competition was having on [NIKE's] business, not that there was increased competition, generally." *In re Acuity Brands, Inc. Sec. Litig.*, 2019 WL 10246166, at *16-17 (N.D. Ga. Aug. 12, 2019); *see* ¶559 (showing market was misled).

42 (CW-2). Further, NIKE's internal goal in fall 2020 was to open 200 NIKE Live stores in North America in three-to-five years, but the stores were performing so poorly that, in July 2022, NIKE cut that goal in **half** to 100 stores (and later cut it down again to 75). *Id*.; ¶160 (CW-2); *see also* ¶347 (CW-1: NIKE kept reducing its target for DTC store openings after summer 2022). Thus, NIKE covertly turned back to its wholesale partners. Per CW-10, NIKE already conducted diligence on potential wholesale partners, Sam's Club and Costco, in ***fall 2021*** so it could "push products" through those channels, as the DTC strategy was "***not working***." ¶332. Per CW-7, inventory piled up and by late 2021-early 2022, NIKE asked wholesalers to take more products and later sold in bulk to City Specialty, Foot Locker, and Finish Line to reduce inventory. ¶333. In fall 2022, NIKE discussed reengaging Macy's—then reengaged with Macy's, DSK, and Foot Locker in 2023. ¶¶334-35. Per CW-1, by end of 2022, NIKE had a "massive backlog" of products that were not selling, so it "strong-armed" Foot Locker into taking "dead" inventory. ¶336. And in June 2024, Donahoe admitted that for "the last couple quarters," NIKE was "leaning in with our wholesale partners." ¶355; *see also* ¶¶352-54, 356, 359. Thus, while Defendants assured there were "no signs of any [demand] softness" and NIKE's channel mix strategy "remain[ed] the same," NIKE was slashing store-opening goals due to demand softness and turning back to multi-brand partners. *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 864-65 (N.D. Cal. 2023) ("we've seen a sustained rise in demand" and "haven't seen any change" false given waning demand).[14]

### 2.    Defendants' Statements Touting CDA's Success Were Misleading

During the Class Period, Defendants repeatedly hailed the success of CDA, claiming, *e.g.*, that the CDA "strategy is definitely working" (¶480). *See also* ¶¶439, 471, 473, 499, 512, 516,

---

[14] Defendants do not respond to Plaintiffs' channel mix allegations for these two statements (MTD at 10, 23 n.7), thus conceding their falsity on this basis.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

520, 522, 533, 540, 566, 573, 575. Defendants also attributed NIKE's growth to CDA's success, *e.g.*, that it was "resulting in healthy profitable growth" (¶537; *see* ¶¶465, 487, 494, 602), and that NIKE's "strong results" were "proof that our strategy is working" (¶¶489, 491-92; *see* ¶¶501, 508, 555, 562, 571). *See also* ¶548. In reality: (i) NIKE's CDA components were failing (*supra* § II.A.1, ¶105); and (ii) its growth was not driven by CDA's success, but by temporary, unrelated factors (¶¶361-88). Thus, by assuring that CDA "was 'working,'" Defendants "materially misrepresented the success of [CDA] and its impact on" NIKE's growth. *Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*, 2025 WL 1900722, at *6 (N.D. Cal. July 9, 2025).

**Component Failures.** The plain meaning of the words that CDA "is working," conveys that NIKE was successfully executing the strategy. Thus, this phrase does not "have some special or nuanced meaning." MTD at 12-13. Nor are these six CDA components "made-up" by Plaintiffs. *Id.* Defendants repeatedly linked CDA's success to these components, as confirmed by analyst and media coverage. ¶¶105-142.[15] In announcing CDA in June 2020, Donahoe described "***three areas of strategic acceleration***" (¶95), which precisely correspond to three of these six components: (i) a pivot to DTC "mono-brand" operations that would rely only on "a small number of strategic [*i.e.*, multi-brand] partners"—*i.e.*, channel mix (¶96); (ii) "realign[ing] the company" around gender and age-based "consumer construct[s]," instead of the prior sport categorization (¶97); and (iii) expansion of NIKE's DTC "digital capabilities in our end-to-end technology foundation" (¶98). Defendants also later touted the importance of these components to CDA. *E.g.*, ¶¶119, 141, 484.[16]

---

[15] Thus, this case is unlike *In re Cloudera, Inc.*, 121 F.4th 1180, 1188-89 (9th Cir. 2024), where the "theory of falsity relied on a specialized meaning" of terms like "cloud-native," which "lack a plain . . . meaning" and the attempt to define them hinged on a blog that did not contain such terms.
[16] Analysts agreed. *E.g.*, ¶125 ("men's / women's / kid's classifications are important accelerators to" NIKE's "digital strategy"); ¶142 ("DTC channel shift [i]s a gross margin driver"); ¶120 (NIKE "using tech to deepen its connection with its customer"; "personalization technology" is "key").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

The other three components were also integral to CDA. For example, Defendants left no doubt of the importance of a DTC supply chain to CDA's success by touting, *e.g.*, NIKE's "pivot to a more [DTC] supply chain." ¶113. Analysts also recognized as much. *E.g.*, ¶¶109-12, 114 (DTC operations require a "reinvention of the supply chain"; NIKE has "enhanced digital/supply chain capabilities"). And, in announcing CDA, Defendants claimed it represented the "next phase" of NIKE's efforts to "accelerate" innovation and "supercharge" its product pipeline—a focus "on product innovation" that was "not going to change" under CDA. ¶¶127-28. Indeed, Defendants linked CDA and NIKE's innovation pipeline in their misstatements. *E.g.*, ¶130 ("pipeline of innovative product . . . prove[s] our strategy is working"); *see also* ¶131 (analyst coverage). Defendants' statements and analyst coverage also show that, under CDA, NIKE would maintain its competitive separation and brand strength. ¶¶136-37 (Defendants: highlighting "the strength of our brand" in announcing CDA; analysts: "Nike's strategy drove further competitive separation").

**Temporary Growth.** As CDA's purpose was to propel "long-term growth" (¶¶99-100), statements touting CDA's success, particularly those tying it to NIKE's financial results, conveyed that the strategy was achieving this goal.[17] Defendants argue these claims were "true" given NIKE's Class Period growth. MTD at 11.[18] Not so. First, NIKE's initial growth in fact was driven by other fleeting factors. CDA was announced in June 2020, a few months after the onset of the COVID-19 pandemic, which limited in-store shopping, leading to a temporary surge in NIKE's Digital sales. ¶362. *See also* ¶¶363-64 (CW-13: COVID provided a "sugar rush"; CW-17: Digital sales "went through the roof" with COVID); ¶365 (similar). Further, NIKE temporarily relied on

---

[17] These statements assuring that CDA "*is working*" are unlike those in *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1196 (9th Cir. 2021), which only generally touted "great progress." MTD at 10-11.

[18] Defendants' claim that revenue growth cited in their exhibits show CDA's "success" (*id.*) is also "improper," as it "assume[s] the truth of an incorporated document . . . to dispute facts" alleged in the SAC. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

selling products that were in its pipeline before CDA. As NIKE's product development typically takes two or more years (¶366), per CW-16, in 2020-2021, NIKE could rely on products already in its pre-CDA pipeline until mid-2022, but then started seeing the negative effects. ¶367. NIKE also flooded the market with its classic products by early 2021, temporarily boosting sales, until it cut the supply of these products in late 2023. ¶368. Thus, Defendants' "statements could plausibly mislead a reasonable investor to believe that [NIKE's] growth was driven by [CDA's success] when, in fact, it was driven by" these other transient factors. *Dentsply*, 665 F. Supp. 3d at 283.

Second, the SAC plausibly alleges that CDA "began to falter" internally (MTD at 11) by Class Period start, long before this failure emerged publicly. And many other "internal warning signs" of CDA's failures were flashing during the Class Period. *DocuSign*, 669 F. Supp. 3d at 867-68, 880-81; ¶¶370-88. Per CW-6, NIKE was "not even close" to hitting Digital revenue targets from 2021-June 2024. ¶377. This is echoed by: CW-9, who attended a sales meeting in summer 2022, where Defendants stated that NIKE was not hitting revenue goals (¶382); and CW-4, who attended monthly finance meetings discussing NIKE's failure to hit topline revenue targets due to DTC struggles (¶¶385-88). In October 2022, CW-16 got an email that NIKE was "doing a massive budget scrub [*i.e.*, cuts] in order to address [CDA-related] headwinds facing the company." ¶383.

Further, per CW-16, Donahoe hosted quarterly all-hands video calls, where, beginning in February 2022, employees pushed back against the CDA strategy in the chat function. ¶378. The pushback was so strong that NIKE temporarily disabled the chat function and punished employees who spoke up—yet the pushback only intensified by 2024, with employees protesting that "CDA was ineffective." ¶¶378-80; *see also* ¶381 (*Wall Street Journal* describing all-hands call where "dozens of people" staged "an online protest"); ¶¶371-73 (All-Employee Engagement Surveys sent to Defendants describing CDA problems by spring/summer 2021). CW-1 described a "dire"

VP summit in September or October 2023, where Donahoe "painted a pretty ugly picture," *e.g.*, that NIKE was no longer a growth company, and top executive Williams, admitted: "***CDA was a failure.***" ¶¶694-700. *See also* ¶¶624, 651. Thus, Defendants' claim that the SAC fails to "plead sufficiently" that CDA "was a failure" is unavailing. *Stitch Fix*, 2025 WL 1900722, at *6-7.[19]

### 3.    Defendants' Misstatements Are Not Inactionable Opinions

Defendants argue two technology statements (¶¶476, 504), two reorganization statements (¶¶475, 484), and ***all*** statements that CDA was "working" (§ II.A.2) are inactionable opinions. MTD at 11-12, 17-18, 22. First, these are not opinions: they "expresse[d] certainty" without opinion qualifiers, *e.g.*, "I think," or described present or past occurrences, *e.g.*, what Defendants were "seeing," which relate facts. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015).[20] Second, even if treated as "opinion," the statements are actionable as they "omit[ed] material facts" about the faltering state of CDA (*see* §§ II.A.1-2), which "conflict with what a reasonable investor would take from the statement[s]." *Omnicare*, 575 U.S. at 186, 189; *see also Cutler v. Kirchner*, 696 F. App'x 809, 814 (9th Cir. 2017) ("It is plausible that a reasonable investor, hearing that ***[a project] was working*** . . . would have the impression of a state of affairs materially different from the reality."). Defendants also "did not hold the belief[s] [they] professed," rendering any opinions actionable. *Omnicare*, 575 U.S. at 185-86. *See* § II.B.

### 4.    Defendants' Misstatements Are Not Immaterial Puffery

Defendants wrongly label certain misstatements about innovation (¶¶443, 450, 514, 544, 566, 594), consumer demand (¶548), supply chain (¶441), competition and brand strength (¶¶450,

---

[19] Given such allegations, NIKE did ***not*** give "accurate . . . updates to investors" about the CDA failures (MTD at 13), and this truth-on-the-market defense thus fails yet again (*supra* at 8).

[20] *E.g.*, ¶471 ("we are ***clearly seeing*** our strategy work"); ¶480 (CDA "is ***definitely*** working"); ¶476 ("digital transformation [investments] are making us more agile"); ¶504 (Adobe "has played such an important role"); ¶¶475, 484 ("we successfully realigned our organization").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

461, 489, 512, 514, 533, 535, 540, 544, 557, 566, 571, 573, 577), technology (¶¶476, 504) and the

success of the CDA strategy (§ II.A.2) as immaterial puffery. MTD at 13, 14, 17-18, 22-23. "Only

if . . . the materiality of the statement is **so obvious** that reasonable minds could not differ are these

issues appropriately resolved as a matter of law." *Khoja*, 899 F.3d at 1014; *Fecht v. Price Co.*,

70 F.3d 1078, 1081 (9th Cir. 1995) ("materiality" is "fact-specific" and "should ordinarily be left

to the trier of fact"). "[E]ven general statements of optimism, **when taken in context**, may form a

basis for a securities fraud claim when [they] address specific aspects of a company's operation

that the speaker knows to be performing poorly." *Quality Sys.*, 865 F.3d at 1143. Thus, "reassuring

investors that 'everything [was] going fine'" with specific areas of NIKE's business "when the

[C]ompany knew" otherwise is "materially misleading." *Id*. This is precisely the case here.

       Defendants reassured investors that CDA was "working" when it was not. *See Forescout*,

63 F.4th at 770 (not puffery where "statements contravened the unflattering facts in [company's]

possession"). Defendants touted NIKE's "strong" innovation pipeline (¶¶443, 450, 514, 544, 566,

594) and "strong" brand (¶566, ¶540), which were key "competitive advantages" driving

"separation" (*e.g.*, ¶¶450, 512-14, 544); "strong consumer demand . . . [with] no signs of any

softness" (¶548); the "Adobe platform" as "important" to "delivering . . . personaliz[ation]"

technology (¶504); and a "fairly impressiv[e] pivot" to a DTC supply chain (¶441). These "went

beyond mere optimism by provid[ing] a concrete description of the past and present state of the

pipeline" and other CDA components. *Forescout*, 63 F.4th at 770; *Quality Sys.*, 865 F.3d at 1137-

38, 1144 (same for "strong" "sales pipeline").[21] Indeed, where such facts "might—and allegedly

did—impact the financial health of [NIKE], that information was likely material." *Khoja*, 899 F.3d

---

[21] *See also Allaire*, 224 F. Supp. 2d at 337 (statements touting, *e.g.*, "competitive advantage"
actionable as they are "exactly the types of statements on which investors . . . rely").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

at 1012-13.[22] Defendants have not shown that claims about a strategy that would "unlock long-term growth" and was "critical" to NIKE's success (¶¶708-17) were "so obvious[ly]" unimportant. *Khoja*, 899 F.3d at 1014. Many statements also "were made in response to specific questions asked by financial analysts" or investors and thus "cannot be discounted as mere puffery." *Forescout*, 63 F.4th at 770-71; *see* ¶¶441, 463, 473-82, 499, 533-37, 548, 550, 564, 590-92, 598.[23]

### B.    The SAC Adequately Alleges Scienter

"Particularized allegations that defendants had ***actual access*** to the disputed information, . . . raise a strong inference of scienter." *Quality Sys.*, 865 F.3d at 1145. Thus, scienter may be pled by "not only [] intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Arena*, 840 F.3d at 705. The inquiry is "whether all of the facts alleged, ***taken collectively***," plead scienter, "not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 310. The scienter inference "need not be irrefutable, *i.e.*, of the smoking-gun genre;" rather, viewed "holistically," it must be "***at least as*** compelling as any opposing inference." *Id.* at 324-26.

### 1.    The CW Allegations and Defendants' Admissions Support Scienter

Plaintiffs can establish a strong inference of scienter through CW allegations by satisfying a two-part test: (1) the CWs "must be described with sufficient particularity to establish their reliability and personal knowledge," and (2) their "statements . . . must themselves be indicative of scienter." *Quality Sys.*, 865 F.3d at 1144-45. Here, the SAC easily satisfies both prongs.

---

[22] The statements here ***are*** "capable of objective verification." MTD at 23. For instance, whether NIKE was "in a stronger position relative to our competition than" pre-pandemic (¶461) and had "stay[ed] ahead of the competition" (¶557) were verifiable based on, *e.g.*, market share data.
[23] *See also, e.g.*, ¶¶467, 468, 486, 503, 524, 539, 552, 559, 568, 581, 631 (analysts hailing NIKE's "healthy demand," "pipeline of product innovation," "enhanced digital/supply chain capabilities," "dominant market share," "and "strong conviction around its CDA strategy").

### a.    The CWs Have a Sufficient Basis of Knowledge

To satisfy the first prong, a complaint must describe CWs "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* at 1145. The SAC pleads ample details about the CWs' job descriptions, such as their roles, duties, and tenures (and, often, "exact titles" and reporting structure), to show they were positioned to know the attributed information. *Quality Sys.*, 865 F.3d at 1145; ¶¶54-72.

Defendants' attacks on the CWs fail. First, Defendants do not contest, and thus concede, that the descriptions of CWs 3, 4, 6, 8, 10, 11, 14, 16, 17, and 19 satisfy the first prong. MTD at 27. Second, Plaintiffs do not "concede [a] lack of particularity" as to CWs 2, 5, 7, 12, 13, 15, and 18. MTD at 27. Plaintiffs withheld ***additional*** employment details at the CWs' request to protect their anonymity and believe their descriptions, which provide "job titles or responsibilities" (*id.*) and tenures, satisfy the PSLRA. ¶55, n.6; ¶58, n.7; ¶60, n.8; ¶65, n.9; ¶66, n.10; ¶68, n.12; ¶71, n.13.

Third, Defendants' nitpicking of CWs 1, 2, 9, and 15 (MTD at 27) fails. Plaintiffs do not merely allege that CW-1 attended meetings where DTC supply chain problems were discussed, but that Defendants received the meeting reports describing these problems. ¶¶154-55. CW-1's description of the fall 2023 VP summit attended by CW-1 and Defendants establishes her knowledge of that meeting. ¶¶265-71, 319; *see Forescout*, 63 F.4th at 771 ("Plaintiffs need only provide a basis for each CW's knowledge about the specific statements he made."). CW-9 observed Donahoe and Friend admit in a sales meeting in summer 2022 that NIKE was not hitting its total revenue goals. ¶693;[24] *see In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *27 (N.D. Cal. Mar. 21, 2018) (CW who "personally observed [defendant] admit" issues at sales meeting reliable). CW-2 knew of innovation and supply chain problems, as she reviewed sales

---

[24] CWs 1, 6, and 4 corroborate that NIKE missed revenue goals. ¶¶349, 377, 706-07.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

metrics for NIKE Live stores that had supply chain problems, attended Brand meetings discussing competition, and drafted quarterly business unit review reports with updates on operations. ¶¶55, 160-64, 288, 321, 340-42, 704.[25] Thus, Defendants' "quibbl[ing] that these witnesses weren't in a position to see the [information] first-hand" fails. *Berson*, 527 F.3d at 985. It is of no moment that CWs did not "report[] directly" to or interact with Defendants (MTD at 27)—such "direct contact" is not required. *Roberts v. Zucora, Inc.*, 2020 WL 2042244, at *10-11 (N.D. Cal. Apr. 28, 2020). Defendants are also wrong that CW-3 is "the only" CW who had direct contact with them. MTD at 27; *see* ¶680 (CW-8); ¶¶378-80 (CW-16); ¶693 (CW-9); ¶154, 265-71 (CW-1).

### b.    The CW Allegations Are Indicative of Scienter

In assessing the second prong, courts "look to the level of detail provided by the [CWs], the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Zucco*, 552 F.3d at 995. Here, *19* CWs offer specific, corroborative details of the CDA strategy failures throughout the Class Period, and they are corroborated by, *e.g.*, Defendants' later admissions and reputable news reports. *See Lattice*, 2006 WL 538756, at *16. The CW accounts show that Defendants had "actual access" to or knew of these widespread CDA problems that undermined their positive public claims, which pleads scienter. *Quality Sys.*, 865 F.3d. at 1145; *Sylebra Cap. Partners Master Fund Ltd. v. Everbridge, Inc.*, 2025 WL 1938359, at *1-2 (9th Cir. July 15, 2025) ("reviewed holistically," CW accounts of "widespread" issues supported scienter).[26]

**Supply Chain.** Per CW-1, who attended quarterly audit meetings, Donahoe, Friend,

---

[25] CW-15, who worked in the technology group and attended meetings with technology leadership where she raised DTC-related concerns, received input about NIKE's strategic failures in product innovation and decline in competitive standing from colleagues. ¶¶68, 251, 289, 374, 743.

[26] Contrary to Defendants' argument (MTD at 29), CW "hearsay" supports scienter when it is "reliable, plausible, or coherent." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016).

O'Neill, and the Board (including Parker) received reports from these meetings describing DTC supply chain problems during the Class Period. ¶¶154-55.[27] Defendants' attack on CW-1's specificity (MTD at 28) fails. *NVIDIA*, 81 F.4th at 924, 947, rejected the argument that pleading scienter based on internal reports requires describing the reports' "specific contents."[28] And CW-1 detailed these problems. ¶¶146-59. "Requiring more detail . . . would transform the PSLRA's formidable pleading requirement into an impossible one." *Forescout*, 63 F.4th at 769.

**Technology.** Per CWs, Defendants and other top executives repeatedly discussed problems plaguing NIKE's DTC technology capabilities and organization. In December 2021, CW-8 raised concerns about Lavu in an email to Donahoe and O'Neil. ¶680; *see also* ¶¶240-41 (CW-8 describing concerns). CW-3, who was recruited by and initially ***reported directly*** to O'Neil (¶175), had many meetings about such issues with Defendants starting in early 2022: (i) ***one-on-one ad hoc meetings with Donahoe***, ***CW-3's "life mentor*****,"** starting in January or February 2022 about NIKE's DTC technology problems and concerns about Lavu's organization (¶¶173, 679); and (ii) monthly meetings with Donahoe, Friend, O'Neil, and Campion starting in ***May-July 2022***, discussing these problems, *e.g.*, the Adobe partnership and NIKE's lacking personalization capabilities—meetings that were instituted because CW-3 raised concerns about the technology group's inability to support the DTC strategy (¶¶675-79). This is corroborated by CW-12, who recalled that Donahoe, Lavu, and ***CW-3*** regularly met to discuss NIKE's DTC technology issues. ¶678; *see also* ¶¶171-201. These "personal conversations" between CW-3 and Donahoe, and other Defendants, show that they were "aware of major issues" with NIKE's DTC technology under CDA when they were "making outward statements that [CDA] was 'on track,'" and thus support

---

[27] Per CW-2, supply chain problems contributed to the lowering of store-opening goals in July 2022 (¶161)—a major corporate decision likely made with knowledge of Defendants (¶¶730-33).
[28] *NVIDIA Corp. v. Ohman J*, 144 S. Ct. 2655 (2024); 2024 WL 989551; 604 U.S. 20 (2024).

29
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

scienter. *Extreme Networks*, 2018 WL 1411129, at *27-28.[29] Defendants were aware of more than "***some*** challenges" (MTD at 29), and their failure to disclose these problems renders their conduct at least deliberately reckless. *Arena*, 840 F.3d at 708 ("express[ing] confidence" and "failure to inform the market" about issues was "an extreme departure from the standards of ordinary care").

**Corporate Reorganization.** Per CW-18, NIKE began pivoting back to sport-based categories in mid-2022 (¶264)—a major corporate change that must have been made with knowledge of high-ranking executives, including Defendants (¶¶730-33). Indeed, CW-1 described a summit in September or October 2023 with Donahoe, Friend, O'Neill, and 300 VPs, where O'Neill presented a plan to address CDA strategy failures, including leaning into "fields of play"— *i.e.*, NIKE's re-created sport-based categories. ¶¶694-700. And in December 2023, Donahoe disclosed that "six months ago" (June 2023), NIKE had "realigned our entire organization." ¶273. Thus, as such red flags about the reorganization failures were accessible to Defendants "without extraordinary effort," by mid-2022, they were, at the least, deliberately reckless in "fail[ing] to obtain and disclose such facts." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010).

**Innovation Pipeline.** In 2024, Donahoe admitted that NIKE: (i) intentionally increased the supply of classic franchises, instead of new innovative products, by "***early 2021***" (¶305); (ii) had an innovation "gap" by ***summer 2022*** (¶301); and (iii) tried to "rebuild[]" its pipeline by early 2023 (¶298). These admissions are corroborated by: (i) CW-1, who explained that NIKE's oversaturation of the market was a "dirty secret" that "everyone saw" internally (¶292); (ii) CW-16, who alleged that by mid-2022, "there was no way" senior leadership did not know of NIKE's innovation/pipeline problems (¶736); and (iii) CW-2, who stated that product-pipeline

---

[29] This specificity distinguishes *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) (MTD at 29), where the plaintiffs alleged merely unspecified "problems." Defendants' demand for "more detail" about CW-3's meetings is more than is required at this stage. *Forescout*, 63 F.4th at 769.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

problems contributed to the decision to lower store-opening goals beginning in July 2022 (¶160-61)—a major corporate decision likely made with knowledge of top executives like Defendants (¶¶730-33). "Reviewed holistically," such later admissions and CW accounts of contemporaneous "widespread" issues known internally, support scienter. *Everbridge*, 2025 WL 1938359, at *1-2.

**Competition and Brand Strength.** CW-2 described quarterly Brand meetings—led by the Chief Marketing Officer and the VP of North America Marketing—where "cool" factor metrics were discussed, showing that by ***May 2022***, NIKE was no longer the top brand and was losing ground to competitors. ¶¶321, 701-04. These results, along with details of how each business unit was performing, were documented in reports sent to ***O'Neill*** (who reported to Donahoe). *Id*.[30] Per CW-1, at the September/October 2023 VP summit attended by Donahoe, Friend, and others, O'Neil presented a remediation plan, as NIKE was "no longer number 1, number 2, or number 3 in running products." ¶319. Thus, "[t]aken collectively, statements by [CWs] establish that members of executive-level management, including individual defendants, had access to" adverse information contradicting their competition and brand statements. *Quality Sys.*, 865 F.3d at 1145.

**Channel Mix.** CWs show that NIKE began covertly turning to wholesalers in 2021, which accelerated through the Class Period (CW-10, ¶332; CW-7, ¶333-35), and began drastically lowering its store-opening goals in July 2022 (¶¶338-44)—both of which are major corporate changes presumably made with knowledge of high-ranking executives, such as Defendants (¶¶730-33). Indeed, per CW-2, O'Neill led the NIKE Live team, and, per CW-1, Friend was "100%" involved in the decision to cut store opening goals, as Friend was in charge of allocating funds for this purpose (¶349). CW-1 further described that in late 2022, Donahoe and Friend "strong-armed" Foot Locker into taking NIKE's "dead" inventory, to avoid a stock drop. ¶336.

---

[30] Defendants' demand for exact dates and content of the reports contravenes *NVIDIA*. *Supra* at 29.

**Additional Red Flags.** Defendants knew of other CDA red flags during the Class Period. Per CW-16, Donahoe, Friend, and O'Neill received All-Employee Engagement Survey data with negative feedback about the CDA problems by spring/summer 2021. ¶¶371-73. Per CW-12, Donahoe received significant push-back on CDA in all-hands calls (also attended by O'Neill) beginning in February 2022, triggering retaliation against employees who spoke up. ¶¶688-91; *see also* ¶692 (*Wall Street Journal* coverage). In summer 2022, Donahoe and Friend advised the sales team, during a meeting attended by CW-9, that NIKE was not hitting its revenue goals. ¶693. And during CW-4's tenure (March 2022-April 2023), she attended monthly finance meetings where attendees discussed that NIKE was struggling with the DTC strategy and not hitting its topline revenue projections—information that was escalated to Donahoe through financial reports CW-4 helped prepare and in quarterly earnings briefings. ¶¶706-07; *see also supra* at 27 n.24. In September or October 2023, at the "dire" VP summit attended by CW-1, Donahoe, Friend, and O'Neill: (i) ***Donahoe "painted a pretty ugly picture" of NIKE's performance and admitted it was no longer a growth company***; (ii) management acknowledged softening business due to lack of investment in DTC capabilities; and (iii) Williams declared that "***CDA was a failure***." ¶¶694-700.

### 2.    Core Operations and Defendants' Close Monitoring Support Scienter

"The core operations theory of scienter relies on the principle that corporate officers have knowledge of the critical core operation of their companies." *Stitch Fix*, 2025 WL 1900722, at *9. This theory supports scienter here. By Class Period end, DTC revenue comprised 44% of NIKE revenue. ¶¶709-10. Defendants also repeatedly touted the CDA strategy, and its components, as the fundamental driver of NIKE's "long-term growth and profitability"—including that NIKE's strong "brand" and DTC technology were "critical," product innovation was "key" and NIKE's "heart and soul," and its "digital first supply chain" was "[c]entral." ¶¶711-17. Analyst and media

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

coverage confirmed as much. *E.g.*, ¶¶100, 105-42. Thus, it would be "absurd to suggest" that Defendants "did not know about the relevant facts that rendered their statements misleading." *Hayden v. Portola Pharms., Inc.*, 2021 WL 3506614, at *5 (N.D. Cal. Aug. 10, 2021); *Stitch Fix*, 2025 WL 1900722, at *9 (new initiative "was so important to [company's] business that it would be implausible" that Defendants, "as top executives in the company," were unaware of the facts).

Critically, Plaintiffs plead this theory "in conjunction" with "specific allegations about management's exposure" to the at-issue facts. *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008); *see supra* § II.B.1. Thus, it bolsters scienter when viewed together with such CW accounts of "actual access." *Stitch Fix*, 2025 WL 1900722, at *9. Indeed, Defendants' close monitoring of CDA and its components indicates a "detail-oriented management style" that supports scienter. *Nursing Home Pension Fund v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004). Defendants tracked the progress of CDA and its components, *e.g.*, by attending meetings and receiving reports on NIKE's DTC technology, supply chain, competition and brand strength, and CDA's impact on operations. ¶¶719-21. Defendants' public statements confirm their close monitoring. ¶¶722-29; *Quality Sys.*, 865 F.3d at 1145 (that defendants "themselves told investors they had real-time access to, and knowledge of, sales information" bolstered scienter). Donahoe touted his understanding of consumer "engagement and membership metrics," Parker claimed that the Board (on which he and Donahoe sat) "oversaw significant transformations in support of the [CDA] strategy," and Friend assured Defendants were "***closely monitoring* consumer behavior, and . . . consumer demand**" and had "inventory visibility," which was critical to supply chain operations. ¶¶723-25; ¶¶726-29 (Donahoe's "expertise in digital commerce [and] technology").

### 3. Defendants' and Other Key Executives' Departures Bolster Scienter

The departures of Donahoe, Campion, and CDIO Lavu support scienter. *See Bielousov v.*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

*GoPro, Inc.*, 2017 WL 3168522, at *7 (N.D. Cal. July 26, 2017) (scienter "bolstered" by defendant "resignation"). On September 19, 2024, two weeks before the final corrective disclosure, NIKE announced the departure of Donahoe, CDA's architect. ¶762. Both NIKE and the media tied this departure to the core of the fraud—CDA's failure. ¶¶763-64. NIKE stated that the new CEO would reverse course on the CDA's major initiatives to again "deliver[] bold, innovative products" and "reconnect" with "trusted [wholesale] partners." ¶763. *The Wall Street Journal* linked his departure to how CDA had "backfired" (¶365). *See also* ¶¶305, 310-12, 353, 640, 667. On January 5, 2024, two weeks after the first corrective disclosure, NIKE announced the departure of Campion, who oversaw major CDA initiatives. ¶761. In February 2023, it was reported that Lavu—who led NIKE's technology group—had "resigned, effective immediately." ¶758. Lavu engaged in corruption and created dysfunction with his "shadow organization," compounding NIKE's technology problems and prompting an internal audit and SEC investigation. ¶¶758-60.

### 4. The SAC's Motive Allegations Support Scienter

Though pleading motive is not required, "personal financial gain may weigh heavily in favor of scienter." *Tellabs*, 551 U.S. at 325. The SAC's motive allegations further bolster scienter. First, Defendants' suspicious stock sales support scienter. Parker made (i) his largest single-day sale since 2015 six months into the Class Period in July 2021 ($22 million), the same day he entered into a 10b5-1 plan allowing him to sell even more shares, and (ii) his largest two-day sale since 2015 ($27 million) in November 2021, a few weeks after he inflated NIKE's stock price by misleadingly touting its pipeline. ¶787. Such "massive and uncharacteristic" sales support scienter. *Quality Sys.,* 865 F.3d at 1146. As to Friend, Defendants concede that he sold 30,000 more shares during the Class Period than the Control Period, yet point to one case where a larger number of shares sold did not support scienter. MTD at 34. But Friend sold 40% more shares during the Class

Period for 60% higher proceeds than during the Control Period—almost **56%** of his total holdings (¶783). *See Provenz,* 102 F.3d at 1491 (20% supported scienter).[31] Second, starting in June 2020, Donahoe, Parker, Friend, and Campion's bonuses were tied to NIKE's stock price relative to the market, which "motivated [them] to inflate . . . [the] stock price[]." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003). ¶¶771-74. Third, during the Class Period, Donahoe and Friend's compensation was tied to "Adjusted Digital Revenue," incentivizing them to increase Digital business and keep a close eye on it. ¶¶775-80.

### 5.   Defendants Have Not Proffered a More Compelling Inference

Viewed holistically, the SAC's allegations plead scienter. *Tellabs*, 551 U.S. at 326. Defendants' competing inference—that they acted "in good faith" and "believed in" CDA and disclosed the issues (MTD at 26, 34-35)—is belied by the facts, which are bolstered by core operations, Defendants' close monitoring, departures, and motive allegations.[32] The stronger inference is that Defendants knowingly or recklessly "withheld important warning signs from the market." *In re BioMarin Pharm. Sec. Litig.*, 2022 WL 164299, at *14 (N.D. Cal. Jan. 6, 2022).[33]

## III.   CONCLUSION

For these reasons, Defendants' Motion should be denied in its entirety.[34]

---

[31] Donahoe's Class Period $13 million proceeds (23% of holdings) were **three times** his Control Period proceeds. If his sales were to pay taxes (MTD at 34) raises a fact issue that does not negate scienter now. *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010).

[32] That NIKE repurchased shares during the Class Period (MTD at 34-35) does not defeat this inference. *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1202 (N.D. Cal. 2012).

[33] As Plaintiffs states a §10(b) claim, and Defendants only challenged §20(a) for lack of a predicate claim, the Court should sustain the §20(a) claim. *DocuSign*, 669 F. Supp. 3d at 887.

[34] If the Court grants the Motion, Plaintiffs respectfully request leave to amend, including to add new developments they are investigating, *e.g.*, O'Neill's departure and technology group layoffs.

DATED: August 11, 2025                    Respectfully submitted,


                                          */s/ Irina Vasilchenko*
                                          Irina Vasilchenko

                                          **LABATON KELLER SUCHAROW LLP**
                                          Carol C. Villegas (*pro hac vice*)
                                          cvillegas@labaton.com
                                          Irina Vasilchenko (*pro hac vice*)
                                          ivasilchenko@labaton.com
                                          Matthew J. Grier (*pro hac vice*)
                                          mgrier@labaton.com
                                          Nicolas Apter-Vidler (*pro hac vice*
                                          forthcoming)
                                          napter-vidler@labaton.com
                                          140 Broadway
                                          New York, NY 10005
                                          Telephone: (212) 907-0700
                                          Facsimile: (212) 818-0477

                                          **LABATON KELLER SUCHAROW LLP**
                                          Mark Willis (*pro hac vice* forthcoming)
                                          mwillis@labaton.com
                                          1050 Connecticut Avenue NW, Suite 500
                                          Washington, D.C. 20036
                                          Telephone: (202) 772-1880
                                          Facsimile: (212) 818-0477

                                          *Counsel for Lead Plaintiffs and Lead*
                                          *Counsel for the Proposed Class*

                                          **DRRT**
                                          Jonathan Cohen (*pro hac vice*)
                                          jcohen@drrt.com
                                          340 West Flagler Street, 2nd Floor
                                          Miami, FL 33130
                                          Telephone: (305) 760-8030
                                          Facsimile: (305) 760-8031

                                          *Additional Counsel for Deka Investment*
                                          *GmbH*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN

**COHEN MILSTEIN SELLERS &
TOLL PLLC**
Steven J. Toll (*pro hac vice*)
stoll@cohenmilstein.com
Molly J. Bowen (*pro hac vice*)
mbowen@cohenmilstein.com
Margaret (Emmy) Wydman (*pro hac vice*)
ewydman@cohenmilstein.com
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

*Additional Counsel for the Proposed Class*

**STOLL STOLL BERNE LOKTING &
SHLACHTER P.C.**
Timothy S. DeJong, OSB No. 940662
tdejong@stollberne.com
Keith A. Ketterling, OSB No. 913368
kketterling@stollberne.com
Cody Berne, OSB No. 142797
cberne@stollberne.com
209 Southwest Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840

*Liaison Counsel for Lead Plaintiffs and the
Proposed Class*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SAC
Case No. 3:24-cv-00974-AN